**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **Criminal No. 18-10450-MLW** |
| | ) | |
| **HENRI SALVADOR GUTIERREZ** | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO SUPPRESS COERCED STATEMENTS**

Henri Salvador Gutierrez's thoughts and words were secretly seized from him and subsequently recorded by a cooperating agent of the government on October 24, 2018. This occurred not because Gutierrez mistakenly brought the agent (hereinafter "CW-13") into his confidence but because Gutierrez was delivered by his keepers from the designated institution in Essex County where state judicial officers ordered him detained for his state court prosecution, to an entirely separate jailhouse: the Middlesex County House of Correction at Billerica, Massachusetts (hereinafter "Billerica").

Awaiting Gutierrez's arrival there, much like an apprehensive airline traveler stranded at an intermediate airport far from his ultimate destination by a disabled plane, was CW-13, a violent criminal and a senior member or high-ranking associate of the alleged transnational criminal organization colloquially known as La Mara Salvatrucha or simply "MS-13." CW-13's antisocial characteristics were, the government would have us believe, in his past as he had embraced his more recently acquired sense of civic responsibility and newly commissioned status as an agent of the government. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

     With CW-13 duly "deputized" as a pro tempore member of the government team, then ready, willing, and able, as well as duly empowered and motivated, to provide substantial assistance in the investigation of another person who has committed an offense as of that time, all that remained was for the government to cause opportunity to knock. When it did so on or after Labor Day 2018, CW-13 did not disappoint, first privately obtaining the information desired by those who would make recommendations to the Court about when he would regain some freedom and then agreeing with the government team prosecuting him to orchestrate the audio recording of a sequel to the original colloquy. On October 24, 2018, this surreptitious recording of the information originally derived from the deliberate elicitation of information from Gutierrez occurred, appearing as a reprise of earlier dialogue gleaned by CW-13 from the successful intimidation and coercion of Gutierrez to obtain information from him about a joint venture homicide in Lynn, Massachusetts on July 30, 2018 (and earlier crimes), committed, *inter alia,* by him and others as members of a group self-identifying themselves as the "Sykos MS-13"

---

[1] At this point in time, CW-13's situation is appropriately analogous to that of a worldly-wise tort lawyer who has successfully persuaded a somewhat dubious client in need of the type of service under consideration that *he* is best suited to represent the client's (*e.g.*, the United States') interests. █████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

clique. That this occurred within the secure confines of a Massachusetts penal institution was anything but serendipitous. Rather, it was the end product of a concerted and coordinated effort by CW-13, ably assisted and coordinated by law enforcement agents and correctional personnel.[2]

The secret recordings are inadmissible for a number of reasons: primarily because they are the product of coercion, but also because they were made without the defendant's knowledge or consent, and without a warrant and without benefit of legal representation. The coercion was pervasive and began from the start, as CW-13 initially presented himself to Gutierrez not only as a violent, hardened, longtime criminal, but also as a senior MS-13 member from a different, more established and superior clique than the one Gutierrez had thrown in with. ███████



---

[2] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

[3] The history and background of CW-13's "audience" for this exposition, Gutierrez, has been succinctly described in the Defendant Eliseo Vaquerano Canas & Jonathan Tercero Yanes's Joint Motion *in Limine* to Exclude Statements Made By Salvador-Gutierrez to CW-13 (Dkt #357). There is little need to guild the lily beyond providing the basic setting for Gutierrez's story:

> On June 17, 2014, Henri Salvador-Gutierrez arrived in the United States as a child after crossing the border between Texas and Mexico. He was 15 years old and alone. On this journey, which spanned several countries, he witnessed women being sexually assaulted and hurt.
>
> Salvador-Gutierrez came to the United States to join his mother who had left him when he was just two years old. In El Salvador he was left in the care of his grandmother. He was often abused by both his grandmother and her friends. *Id.* In his hometown in El Salvador, he witnessed regular violence in the community. The violence and danger of street gangs was so severe that he stopped going to school in the 5th grade.

The opportunity for CW-13 to do so arose in this fashion: Gutierrez and three others, Elisio Vaquerano Canas, Erick Lopez, and Maynor Maltez Romero, were arrested in Peabody, Massachusetts for unlicensed joint possession of a firearm on August 1, 2018; they were held and charged on August 2, 2018, and ordered detained at the Essex County Correctional Facility at Middleton (hereinafter "Middleton"). *See* Complaint 1886-CR09861, Peabody District Court.

Intervening proceedings in the Massachusetts Superior Court culminated in an Order of August 27, 2018, affirming Gutierrez's earlier detention at Middleton (*see* docket in 1877-BP-0587, Feeley, J.) (attached herein at **Exhibit "C"**). Implementing Judge Feeley's decision then occurred at a court hearing of September 6, 2018, when Peabody District Court Judge Barretto again directed that Gutierrez be committed to the Middleton facility (attached herein at **Exhibit "D"**).[4]

Instead, without further court order and in apparent disregard of the provisions of M.G.L. c. 276, §52A (attached herein at **Exhibit "E"**), Gutierrez was summarily taken to (together with co-defendant, Eliseo Vaquerano Canas, who was dropped off at the Nashua Street Jail facility in

---

When he arrived in the United States, he was reunited with his mother who lived in Somerville, MA. Despite having dropped out of school in the 5th grade, he was enrolled in the 9th grade in English learner Classes. He spoke little to no English and was given an IEP.

Noting his profound intellectual disadvantages, he was administered various academic tests in November of 2015. His scores on the Wechsler Individual Achievement Test were all below the 3rd percentile, meaning more than 97% of children his age achieved higher scores. At that time, when he was 15 years old, he was only able to write 5 letters of the alphabet.

He was also administered the Weschler Intelligence Scale for Children to assess his cognitive functioning. He scored in the Borderline Range for Verbal Comprehension, in the Very Low Range for Perceptual Reasoning, Processing Speed, and for Working Memory. Based upon this testing his was diagnosed with an Intellectual Disability and enrolled in special education services. He was also diagnosed with Post Traumatic Stress Disorder.

*Id.* 2-3 (internal citations omitted).

[4] The inaction between August 27, 2018, and September 6, 2018, is most likely explained by commencement of the Labor Day holiday weekend, which ended on Monday, September 3, 2018.

Suffolk County, Boston) and housed at Billerica. Gutierrez described his September 7, 2018,

removal from Middleton and transfer to Billerica in his *Simmons* affidavit, filed herewith:

8.      On September 6, 2018, I was in the Peabody District Court on the firearms charges and the judge said I would continue to be held without bail in Middleton. I expected to be there until at least October 12, 2018, which was my next scheduled court date at Peabody.

9.      However, the next afternoon at Middleton, I was going out for recreation when the guards told me I was being transferred immediately to another jail, but they did not know where. I was not told why I was being transferred. I did not think it was gang-related because I had no trouble with anyone there at Middleton. I was puzzled and asked the guards if I could call my lawyer but was told "no."

10.     I was taken that day to the Middlesex County House of Correction in Billerica, Massachusetts. Elisio Vaquerano Canas, one of my codefendants in the Peabody case (and in this case) was also taken on the same transport but they dropped him off at the Nashua Street Jail in Boston. When I arrived at Billerica, I was processed. I had been wearing sneakers at Middleton, but they did not let me keep those. The guards took them and put them in storage with the rest of my property. I was issued rubber shoes, like shower clogs.

11.     After about three days I was told I could not be in the general population because of concerns about MS-13. I was transferred to a dorm where I heard MS-13 members were being detained, and that is where I met the informant the government is referring to as "CW-13."

12.     I first saw CW-13 one day sitting at a table in the unit and he waved me over. He said he wanted to talk to me because he knew we were both from El Salvador and that he was an MS-13 member. I had never met him personally but knew of him as a senior person in MS-13 with high-level connections and a reputation for violence which gave him "street cred" in my eyes.

13.     At first, I wanted to talk to CW-13 because he was the barber in my unit and I needed a haircut.

14.     CW-13 approached me a number of times after that to talk. At first, I was hesitant to talk a lot to him. I was a little suspicious because he did not wear a prison-issued uniform from Billerica. He was also wearing sneakers which I was not allowed to have for some unknown reason. There was also a pretty big age gap between us and I was not sure I could

relate to him very well, even though he was clearly trying to get to know me better and seemed to have my best interests in mind.

15.     He started warning me from time to time about inmates in the unit to avoid. I began to think that if I was more friendly toward him, he could protect me (either physically or through his connections) from these prisoners or gang members from other areas of Massachusetts or the country. Even if I did not personally like him, we were both Salvadorans and from the stories he told me about his gang life I knew he was the type of friend I needed to get through prison life safely.

16.     Originally, I was a little annoyed by him because he often asked me about MS-13 and gossip he heard about, which I did not feel comfortable discussing. He was always asking about incidents and rumors he had heard about, and he would ask about my friends and which ones might have been involved.

17.     He brought up a number of incidents but the one he seemed to want to discuss the most was a murder in a park he said his MS-13 homeboys had told him about. He thought that I might have information about it.

The government's evidence makes clear that its investigation into Gutierrez's involvement in the Herson Rivas homicide was formally underway well before the Billerica transfer. The FBI had already been alerted that Gutierrez, as well as Vaquerano Canas, Lopez and Romero, had been arrested on August 1, 2018, by the Peabody police. By mid-August federal warrants were granted to the FBI to search the evidence seized during the arrest, including the car and the individual's cellphones which were initially held at the State Police Barracks in Danvers, Massachusetts, suggesting the U.S. Attorney's Office was already involved.

FBI Special Agent Sarah Mazur, a member of the Boston FBI North Shore Gang Task Force, filed a request on August 27, 2018, for a forensic examination of Gutierrez's seized Samsung Galaxy phone:

The Boston Field Office requests an examination to include bypassing the security and data extraction on the device listed in this communication. This is a high priority request as the phone

> belongs to a suspect in recent homicide case. Analysis of this
> phone is related to an ongoing RICO Murder Investigation.

U Request Examination of Evidence by EDAU\MDUS, August 27, 2018 (Bates 10450-6420) (**Exhibit "F-1"**).

On August 29, 2018, the district attorney's office in Essex County had already convened a grand jury to specifically investigate whether Gutierrez and others were involved in the Rivas homicide. *See* Grand Jury Transcript, John Doe Investigation, August 29, 2018, (Bates 10450-6647- 6726). ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

On September 6, 2018, the same day Gutierrez appeared in Peabody District Court for his hearing, and a day before his transfer to Billerica, SA Mazur filed another request for a forensic examination of Gutierrez's phone. In requesting the examination, she wrote:

> This is a high priority request as the phone belongs to a suspect in
> recent homicide case. Analysis of this phone is related to ongoing
> RICO Murder investigation…The target telephone was seized
> when Henri Salvator-Guitterez [sic] aka Perverso was arrested in
> Peabody on firearms charges. Agents believe the Samsung Galaxy
> S9+ Phone contains information pertinent to the murder of Herson
> Rivas and other MS-13 related criminal activities.

U Request Examination of Evidence by EDAUMDUS, September 6, 2018 (Bates 10450-5992-5994) (attached herein at **Exhibit "F-2"**)*.*

Five days later, in a memo to an FBI evidence control technician, SA Mazur confirmed that her evidence was being gathered for the U.S. Attorney's Office: "I am submitting two cellphone extractions into evidence today. Due to investigative priorities and copying data for the AUSA took longer than expected, I was late in submitting the cellphone extractions reports into

evidence." BS_Evidence Memo, September 11, 2018 (Bates 10450-6007) (attached herein at

**Exhibit "G"**).

As these events indicate, the investigation focused almost immediately on the

codefendants in this case and was not initiated by CW-13 calling his attorney sometime after

September 7, 2018, to tell him that one of the random detainees at Billerica had just

spontaneously confessed to him involvement in a murder in a park in Lynn. CW-13's claims

were not a "break in the case," as several law-enforcement groups, including the FBI, had been

looking for weeks into whether Gutierrez and the others were involved. Gutierrez's transfer was

not accidental or happenstance, but coordinated.

CW-13's badgering began upon Gutierrez's arrival in general population at Billerica and

was incessant and unrelenting over the period of September 7 to October 15, 2018. Gutierrez was

concerned for his own safety, but more importantly his fear that the reprisals prophesized by

CW-13 would likely encompass harm to his paramour, his mother, younger brother and sister, as

well as his older brother (a former MS-13 member who then lived out of state), wore down

Gutierrez's freedom of will, impacted the voluntariness of his responses to CW-13 and, in a

phrase, coerced the information CW-13 desired from Gutierrez's lips.

███████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ The professional

exhilaration at the content of CW-13's October 16, 2018, debriefing no doubt engendered

amongst the assembled members of the prosecution team as the informer's tale unfolded, soon

thereafter was undoubtedly subsumed by the prosecuting attorney's jaundiced view of CW-13's

credibility, given his extensive criminal experience and involvement in heinous criminal activity in his own right prior to his more recent epiphany.

The inference that the realization of CW-13's tawdry presentability to a petit jury spawned the plan to again effectuate the warrantless seizure of the incriminating information from the defendant's own lips that had worked so well in the earlier *Recines Garcia* prosecution of Jose Rene Andrade is compelling. What had worked like a charm a short while before would most certainly yield a knockout blow to a target as intellectually challenged as Gutierrez. The affidavit of Supervisory S/A Jeffrey Wood of February 20, 2018 (at Dkt # 2028-1; pp.3-5) (attached herein at **Exhibit "J"**) describes the government view of the warrantless acquisition of Andrade's oral communications with CW-5:

> 13. In late 2015, the FBI Task Force received information from yet another cooperating witness (CW-5) about Andrade. In short, CW-5 stated that he had overlapped with Andrade at a detention facility and Andrade had made admissions to CW-5 about his involvement with MS-13 and his role in the murder of…(JAV).

> 14. In order to gather additional evidence against Andrade about his involvement with MS-13 and to corroborate CW-5's information, the FBI Task Force and the U.S. Attorney's Office decided to have CW-5 attempt to make a recording of Andrade in jail, i.e., the January 19, 2016 recording.

> 15. Prior to having CW-5 record Andrade, the U.S. Attorney's Office and the FBI Task Force sought guidance from the Department of Justice. Although I am not aware of the nature or substance of the guidance sought by the U.S. Attorney's Office, I have been informed that the prosecutors sought guidance from the Department of Justice's Professional Responsibility Advisory Office. The prosecutors subsequently briefed me and we discussed the need to instruct CW-5 that he was not authorized to initiate any conversation about Andrade's prior firearm possession charge, although CW-5 could engage Andrade in conversation about whether that firearm was used by another MS-13 member in connection with the December 2014 murder of Javier Ortiz, or whether Andrade was involved in the July 2015 murder of…(JAV)…

> 16. Further, prior to having CW-5 record Andrade, the FBI Task Force sought guidance from the Department of Justice's Office of Enforcement Operations ("OEO") to ensure that the use of CW-5 in this manner was

appropriate. OEO authorized the FBI Task Force's use of CW-5 to make the January 19, 2016 recording…

17. I personally briefed CW-5 prior to sending him to meet with Andrade on January 19, 2016. I have personally briefed and supervised other inmates in making jailhouse recordings of suspects. Based on my training and experience, such recordings are well-accepted investigative techniques that often result in the gathering of useful evidence.

18. When I briefed CW-5 prior to sending him to meet with Andrade on January 19, 2016,[5] I specifically instructed CW-5 that he was not authorized to initiate any conversation about Andrade's pending firearm charge, although CW-5 was authorized to engage in conversation about who possessed that firearm in connection with the December 2014 murder of…(J.).)…CW-5 was also authorized to discuss the uncharged July 2015 murder of…(J.A.V.).

19. In addition to instructing CW-5 not to initiate any discussion about Andrade's pending firearm change, I advised CW-5 that if Andrade began speaking about his pending firearm charge, CW-5 should steer the conversation away from that topic as soon as he was able to do so without compromising his safety or raising suspicion.

20. The January 19, 2016 recording made by CW-5 captures Andrade making multiple admissions about his involvement in the MS-13 racketeering conspiracy and his involvement in violent acts in furtherance of the MS-13 conspiracy, including his involvement in the plan to murder…(J.A.V.).

21. On January 21, 2016, the grand jury returned a Second Superseding Indictment in *United States v. Recines Garcia, et al.*, No.15-10338. This Second Superseding Indictment, for the first time, charged Andrade (or any of the other MS-13 defendants in this case) with racketeering conspiracy…However, this Indictment did not list the July 2015 murder of…(J.A.V.)…as an example of murder in furtherance of the charged MS-13 conspiracy, nor did it mention Andrade's involvement with the same.

22. On August 30, 2016, the grand jury returned a Fourth Superseding Indictment in *United States v. Recines Garcia, et al.*, No.15-10338. The Fourth Superseding Indictment, for the first time, listed the July 2015 murder of…(J.A.V.)…as an example of the violent acts committed in furtherance of the charged MS-13 conspiracy.

---

[5] ████████████████████████████████████████████████

Andrade's motion to suppress in *Recines-Garcia,* (Dkt # 1862-63, 2025, 2034, 2155, 2204-2207, 2804) the warrantless acquisition of his oral communications by CW-5 was not ruled on by Judge Saylor and suppression was sought on completely different grounds than those advanced by Salvador Gutierrez presently in this matter.[6]

Two points about the differences between the two situations are noteworthy:

1. The acquisition and recording of Andrade's oral communication occurred in the context of an exclusively federal proceeding[7] ████████████ ████████████████████████████, while Gutierrez, unlike Andrade, was at the time his conversations were surreptitiously elicited and subsequently recorded was in Massachusetts custody, detained on Massachusetts process in a Massachusetts Correctional facility, presumably entitled to the due process of law accorded all Massachusetts residents by the provisions of the U.S. Constitution and Articles X, XII and XIV of the Massachusetts Declaration of Rights.

2. The jailhouse "scuttlebutt" that cooperation which produces evidence of murder most usually will result in a sentence of time served, no deportation, and witness protection plus relocation, was undoubtedly well known to "jailhouse



cognoscenti" like CW-13,[8] and provided a powerful incentive for those possessed of the moral lassitude CW-13 evidenced prior to his recent conversion to lawfulness to wheedle, cajole, coerce and generally to utilize "any trick in the book" to obtain that all important "get out of jail" card from any "mark."[9]

The deliberate chicanery[10] employed by the government to place Gutierrez in CW-13's presence, who both coerced Gutierrez and "baited" him with a gratuity to obtain information, led to alleged admissions in an inadmissible, warrantless, single-party "consensual recording" that was contrary to state and federal law and was constitutionally unfair. For the reasons set out below, this Court should hold the statements themselves, the recordings, and any transcriptions, English or Spanish, inadmissible at trial. Further, because the statements are hearsay and were obtained through CW-13's coercion of Gutierrez, CW-13 must be precluded from testifying to those conversations at trial.

---

[8] 

[9] The Labor Day 2017 delivery of this intellectually challenged neophyte, Gutierrez, to Billerica for an indeterminate period must have seemed like "manna from heaven" to its beholder, the grizzled-street wise "veteran," CW-13.

[10] "Deliberate chicanery by the government intended to subvert an accused's Sixth Amendment rights, by delaying formal charges, may give rise to a right to counsel before charges are brought." *United States v. Bartelho*, 129 F. 3d 663, 675 (1st Cir. 1997) (citing *Roberts v. Maine*, 48 F. 3d 1287, 1291 (1st Cir. 1995); *see also United States v. Harrington*, 749 F.3d 825, 830 (9th Cir. 2014); *United States v. Pogsoa* (11-CR-17) 2012 BL 142841 *11 (D.V.I., June 8, 2012) (finding insufficient evidence of prosecutorial collusion to warrant attachment of Sixth Amendment right to counsel but recognizing deliberate chicanery by the government may affect attachment of defendant's constitutional rights). The excerpt from the DOJ/FBI Law Enforcement Bulletin of July, 2001 (Vol. 70, 7) (attached herein at **Exhibit "K"**) strongly suggests that "deliberate chicanery" has been elevated to a law enforcement art form.

I.     **THE DEFENDANT'S STATEMENTS TO THE GOVERNMENT'S AGENT WERE NOT VOLUNTARY AND WERE MADE AS THE RESULT OF INHERENT INTIMIDATION AND COERCION, IN VIOLATION OF FIFTH AMENDMENT PROTECTIONS AGAINST THE USE OF SUCH COERCED CONVERSATIONS AGAINST AN ACCUSED.**

Prior to his incarceration at Billerica the defendant was not personally acquainted with CW-13. However, as CW-13 had "homeboy" status in MS-13 the defendant had heard of him by reputation and was familiar with CW-13's penchant for violence. After the two began to talk within the facility, CW-13 bragged to the defendant that he and another MS-13 member had killed someone on orders from MS-13 leadership, in order to achieve the elevated "homeboy" status in the gang.

The defendant did realize that CW-13 was not someone he could safely ignore or avoid, particularly in the confined setting of a correctional facility where the defendant was vulnerable to attack not only from CW-13 but also from other inmates, whether gang-related or not. The government was likely aware of CW-13's dangerous past, and understood the defendant could not realistically refuse to speak with CW-13 while detained at Billerica. If, as the defendant eventually assumed, CW-13 was not an informant, by declining to speak with him the defendant could have raised suspicion that he himself was cooperating with the prosecution, a dangerous posture in a prison. CW-13's status and his continuing contact with other MS-13 gang members on the outside who could harm or kill the defendant's family members, giving him tremendous power over the defendant, was the reason he was chosen as the agent to wear the wire in his shoe and interrogate the defendant. In addition, CW-13 had every incentive to produce the information which he knew the police hoped to obtain, as his own federal case carried with it a heavy potential sentence in a U.S. Bureau of Prisons correctional facility.

13

Under the Fifth Amendment, "[n]o person ... shall be compelled in any criminal case to be a witness against himself." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189-190 (2004).[11] The protections afforded to Massachusetts residents against self-incrimination are even broader under Article 12 of the Massachusetts Declaration of Rights. *See Commonwealth v. Mavredakis*, 430 Mass. 848, 858-859 (2000) ("Article 12 provides that '[n]o subject shall . . . be compelled to accuse or furnish evidence against himself.'  Its text, its history, and our prior interpretations conclusively establish that it provides greater rights than those enumerated in the Federal Constitution.").

In order for any statement to be admissible by the government against the defendant, pursuant to the Fifth Amendment, the statements must be voluntary. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Custodial statements are admissible if they "are the product of a free and deliberative choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "It is of course a constitutional principle of long standing that the prosecution must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *United States v. Salemme*, 91 F. Supp. 2d 141, 348 (D.Mass. 1999) (quoting *Rogers v. Richmond*, 365 U.S. 534, 541 (1961) (internal quotations omitted).

---

[11] After receipt of the warnings required by *Miranda v. Arizona* when initially arrested, and having been further so advised after arraignment on the Massachusetts firearm joint possession complaint, separating Gutierrez from his attorney and moving him to a different venue and then questioning him after this clear assertion of his wish to remain silent and to have the assistance of an attorney to defend him, and to resist his detention on the charges in the Massachusetts District Court complaint clearly violates *Edwards v. Arizona*, 451 U.S. 477, 482-486 (1981); *Arizona v. Mauro*, 481 U.S. 520, 527-530 (1987) (no compulsion where suspect asked to see wife, agreed to police officer presence in room and to tape recording of conversation). *Maryland v. Shatzer*, 559 U.S. 98, 106-109, 112-114 (2010), is inapposite, as the suspect being questioned by police investigators was a sentenced prisoner not in custody, whereas Gutierrez was a detainee whose invocation of silence was under the totality of the circumstances, which was scrupulously denigrated and devalued in this coordinated endeavor premised on duplicity (indeed fraud) and coercion well beyond what was allowed under *Michigan v. Mosley*, 423 U.S. 96, 104-106 (1975); *United States v. Casey*, 825 F. 3d 19-21 (1st Cir. 2016); *United States v. Taylor*, 985 F. 2d 3, 7-8 (1st Cir. 1993).

"To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel*, 542 U.S. at 189 (citing *United States* v. *Hubbell*, 530 U.S. 27, 34-38 (2000)).[12] A review of the transcript shows that CW-13 was extremely persistent in his interrogation of the defendant. The defendant had no realistic option but to answer CW-13's questions. This was not a voluntary choice on the defendant's part. Knowing CW-13's violent criminal past and knowing what could happen to him or his family if he did not cooperate, the defendant was compelled to participate in the conversation. What he clearly did not know was that CW-13 was an agent of law enforcement and, as such, did not recognize that a police interrogation was underway.

Although a spontaneous confession is admissible, even one made in police custody, it is not voluntary if the government or their agents "interrogate the individual, *i.e*., engage in '[a] practice that the police should know is reasonably likely to evoke an incriminating response.'" *United States v. Diaz-Rosado*, 857 F. 3d 116, 122 (1st Cir. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301(1980)). Such action constitutes "coercive police activity," which can render the information gained during a custodial interrogation constitutionally infirm and unusable. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Diaz-Rosado*, 857 F.3d at 122. A review of the transcript shows that the defendant did not spontaneously offer information regarding the alleged crime which the government has based its entire case but instead answered questions posed to him by a dangerous MS-13 member, questions he felt compelled to answer and which were

---

[12] A suspect's lack of awareness of all the crimes about which questioning may encompass does not vitiate an accused's decision to waive his *Miranda* rights and speak with law enforcement. *Colorado v. Spring*, 479 U.S. 564 (1987). Compulsion upon the person is an important element of the privilege against self-incrimination and "the prohibition of compelling a [person] to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from" the individual. *Holt v. United States*, 218 U.S. 245, 252-253 (1910); *Couch v. United States*, 409 U.S. 322, 327-328 (1973). Coercion is determined from the perspective of the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). Custodial interrogation is questioning by law enforcement officers (or their agents)…after a person is in "custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 484-445 (1966); *Beckwith v. United States*, 425 U.S. 341, 345-346 (1976); *Arizona v. Mauro*, 481 U.S. 520, 526-527 (1987).

designed to elicit a certain response regarding the incident in question. CW-13, himself possessed of a working insider's knowledge of life in an MS-13 clique, had been coached on who to talk with and what specific topics to cover. This line of interrogation was at the government's direction and not something CW-13 dreamed up on his own.

Coerced statements and confessions are notoriously unreliable, and those that are elicited in a jail by a government plant are even less reliable, considering the braggadocio an inmate might believe is necessary to appear tough and not vulnerable or weak to other inmates. Puffery, exaggeration and flat-out falsehoods may be what allows an inmate to impress and, therefore, survive in one piece an encounter with a dangerous prisoner, such as CW-13.[13] Under due process, however, the truth of the "confession" is immaterial. The question, instead, is "whether the behavior of the State's law enforcement [] was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 US 534, 544 (1961).

Gutierrez does not quarrel with the principle that, as a general rule, the Constitution does not protect wrongdoers from misplaced confidence in their associates. *See Lewis v. United States*, 385 U.S. 206, 210-211) (1966) (no Fourth Amendment violation where defendant invited undercover agent inside his home for a narcotics sale);[14] *Hoffa v. United States*, 385 U.S. 293, 302 (1966) (no expectation of privacy in hotel room where defendant repeatedly invited government informant inside to discuss illegal matters); *Weatherford v. Bursey*, 429 U.S. 545,

---

[13] This is particularly so in situations where the questioner (CW-13) has "loosened the speaker's tongue" by skillful employment of veiled threats of harm or danger to the speaker or those he, Gutierrez, cares for (family, children, friends) coupled with planting the seed that confiding in the questioner will assuage or dissipate the fears, concerns and pressures created by him.

[14] Essentially, an illustration of *caveat emptor*.

557 (1977) (informant was invited to attend attorney-client session, and declining the invitation could have unmasked his undercover status to the parties).

Nor does he disagree with caselaw in which defendants had clearly misunderstood their legal position or rights. *Beckwith v. United States*, 425 U.S. 341, 347 (1975) (defendant's incriminating statements not protected by *Miranda* as he was not in custody at the time of questioning). Further, he understands that not every incriminating statement, even while in custody, is subject to *Miranda* warnings when such statements are made as boasts to a cellmate – or an undercover officer posing as a cellmate. *Illinois v. Perkins*, 496 U.S. 292, 298 (1990).

However, in *Mathis v. United States*, 391 U.S. 1, 4-5 (1968), a case in which the defendant was interrogated for tax fraud while in jail on other charges, the Supreme Court declined to narrow *Miranda* to apply only to defendants in custody for the very case for which they are being questioned. *Id.* "There is no substance to such a distinction, and in effect it goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights." *Id.* at 4. And *Perkins*, which certainly bears some passing resemblance to the facts of the case-at-bar, is distinguishable, as the undercover agent there did not coerce the information regarding a crime out of the defendant. The agent, who the defendant believed to be another inmate, gained the defendant's trust by planning a jail break with him. *Perkins,* 496 U.S. at 295. During the planning he casually asked the defendant if he had killed anyone, and the defendant confessed readily to the very crime the agent was investigating. *Id. Perkins* did not involve coercion. The accused and the undercover officer apparently voluntarily interacted with one another.

*Perkins*, therefore, is a but a sequel to Hoffa: involving a tale of the unfortunate consequences flowing from a defendant's voluntary but misplaced confidence in an associate's

fealty to a pledge of secrecy, this time performed by actors in prison mufti. The coercion absent in *Perkins* was present here "in spades" not from a display of official force, threat or violence but from a far more insidious quadrant viable, imminent threats of physical harm to Gutierrez's uninvolved (or innocent) family members, then intimate partner and/or child. Gutierrez's dealings were with CW-13, an individual with a known penchant for violent acts and the outside connections that made him someone the defendant needed to fear, either for his own safety or the safety of his family, if he did not "play ball." "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id*. at 296.

Gutierrez acknowledges that "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-512 (2012) (discussing "custody" in light of *Berkemer v. McCarty*, 468 U.S. 420 (1984); and *Maryland v. Shatzer*, 559 U.S. 98 (2010)). *See also United States v. Melo*, 954 F. 3d 334, 339-340 (1st Cir. 2020)). What is important here though is that Gutierrez, a noncitizen of marginal intelligence, possessed of a rudimentary education and who was a relatively recent arrival in the country, was surreptitiously transferred from one detention facility to another, unable to escape, evade or avoid an admitted MS-13 member (of considerable standing and seasoning) ten (10) years his senior. Gutierrez admittedly could have ended the association after the initial encounter, but only by disregarding the real physical risks that were stated as consequences to his family members and romantic partner should he spurn CW-13's friendship and inquisitiveness.

He could not, however, physically distance himself from CW-13 or avoid physical association with him. Gutierrez was detained pending further order of a court or until trial. He was not incarcerated for a set term of months or years, though he was most certainly was

friendless and alone, acutely aware that any prospect of release on bail or conditions not being a mere mirage was contingent on his good behavior. This realistically left the defendant with no way to avoid 13's importuning, blandishments and "pulling rank" on Gutierrez. That Gutierrez was not aware that the compulsion was "official coercion" is of no moment given that, objectively speaking, it was. *See Arizona v. Fulminante*, 499 U.S. 279, 287-288 (1991); *United States v. Hughes*, 640 F.3d 428, 437-438 (1st Cir. 2011)[15]; *Lynumm v. Illinois*, 372 U.S. 528, 534 (1963); and *United States v. Hufstatler*, 782 F.3d 19, 21-22 (1st Cir. 2015). The short of the situation is that Gutierrez was, during the months of September and October, 2018, between the proverbial "large rock and a hard place," because the government – not him – had maneuvered him there and its minions were then further figuratively pushing the rock to loosen the defendant's tongue. This was coercion, applied by an agent of the government and its end product should not be admissible as evidence in courts of the United States.

*United States v. Boskic*, 545 F. 3d 69, 83-84 (1st Cir. 2008), discussed the interplay between the Fifth and Sixth Amendments when criminal defendants confront "custodial interrogations that are hallmark of the investigative process," noting that until formal charges are initiated suspects must rely on the Fifth Amendment and the prophylactic, now constitutionalized rule of *Miranda*. *Boskic*'s challenge foundered because although he claimed to be victimized by

---

[15] *Hughes*, 640 F.3d at 438, directs courts confronted with claims that statements made are involuntary or coerced to "sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation." Here, the circumstances surrounding the interrogation include the fact that Gutierrez had been detained (not incarcerated) on a charge of joint possession of a firearm without a license. While attempting to obtain release on bail or with acceptable conditions of release, he, a resident alien with family support and a place to reside, was shunted away from counsel and family and lodged at a different institution. Unlike the defendant in *Maryland v. Shatzer*, 559 U.S. 98, 112-114, Gutierrez was not incarcerated for a period defined by imposition of the sentence meted out by a criminal court. He was accused of only jointly possessing a firearm without the requisite license (considered a nonviolent crime under federal law *United States v. Doe*, 960 F.2d 221 (1st Cir. 1992)) and merely detained (without having exhausted his bail review rights pursuant to M.G.L. c. 276, §§57-58) pending further proceedings in the Essex County Superior Court. On the record, as it existed prior to November 28, 2018 (the initial indictment date in the above-named case), his liberty was quite attainable on suitable conditions of release had his keepers not become adjunct law enforcement agents. *See United States v. Francois*, 715 F. 3d 21, 32-33 (1st Cir. 2013).

deceptive interview tactics that were tantamount to coercion, he was not in custody when the law

enforcement trickery was visited upon him. He – unlike Gutierrez – voluntarily responded to a

notice to appear for an interview at the JFK Federal Office Building by agents of the Joint

Terrorism Task Force. Although a warrant for Boskic's arrest had been obtained from the Court,

the agents determined to interview Boskic before arresting him on the warrant. *Id.* at 72 and n.15.

*Colorado v. Connelly*, 479 U.S. 157, 167 (1986), noted that coercive law enforcement

"activity is a necessary predicate to the finding that a confession [or an inculpatory statement] is

not voluntary within the meaning of the Due Process Clause."[16] CW-13's status as a government

agent and point person whom the prosecution team utilized to obtain information from Gutierrez

during his temporary relocation from Middleton to Billerica for the purpose addressed earlier in

this memorandum, satisfies the law enforcement activity component of *Colorado v. Connelly*'s

test. The coercion applied by CW-13 to "loosen Gutierrez's tongue" is analogous to the coercion

the Court determined was practiced upon Oreste Fulimante or Beatrice Lynumn in facts outlined

in respective Supreme Court decisions that bear their names. The mirror image of that coercion,

the lack of voluntariness of the defendant's statements to CW-13, is obvious and apparent from

---

[16] *Connelly,* 479 U.S. at 166, stated:

> The most outrageous behavior by a private party seeking to secure evidence against a defendant
> does not make that evidence inadmissible under the Due Process Clause. *See Walter v. United
> States*, 447 U. S. 649, 656 (1980); *Coolidge v. New Hampshire*, 403 U. S. 443, 487-488 (1971);
> *Burdeau v. McDowell*, 256 U. S. 465, 476 (1921). We have also observed that "[j]urists and
> scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the
> societal interest in law enforcement by its proscription of what concededly is relevant evidence."
> *United States v. Janis*, 428 U. S. 433, 448-449 (1976). See also *United States v. Havens*, 446 U. S.
> 620, 627 (1980); *United States v. Calandra*, 414 U. S. 338 (1974). Moreover, suppressing
> respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees.
> The purpose of excluding evidence seized in violation of the Constitution is to substantially deter
> future violations of the Constitution. See *United States v. Leon*, 468 U. S. 897, 906-913 (1984).

Justice Brennan dissenting in *Connelly*, at 182, collected past authority noting the court's "distrust for reliance on
confessions is due, in part, to…their decisive impact upon the adversarial process." *See also In Re Grand Jury
Proceedings*, 814 F. 2d 791, 794-795 (1st Cir. 1987).

their differing ages, backgrounds and seasoning before even considering Gutierrez's well

developed history as an intellectually challenged individual (a record that was or certainly should

have been known to some members of the prosecution team).

Gutierrez acknowledges that "trickery is not automatically coercion," and some false

assurances to a suspect that he is not in danger of prosecution are permissible. *United States v.

Byram*, 145 F. 3d 405, 407-408 (1st Cir. 1998); *Boskic*, 545 F. 3d at 77-79; *United States v.

Flemmi*, 225 F. 3d 78, 91-92 and n.5 (1st Cir. 2000) (whether evidence shows the law

enforcement conduct was inadvertently misleading or consciously misleading is but one factor in

the totality of circumstances test applied to analyze the voluntariness question).[17] In those cases,

the trickery involved came from the mouths of law enforcement personnel acting openly and

obviously *qua* law enforcement officers. That the officers were speaking with "forked tongues"

does not obscure the fact that their status as law enforcement was also obviously apparent to the

suspect in those cases. The rationale animating those decisions is bolstered by plain common

sense: if suspects routinely lie to police, why should police (plainly identified as such) be denied

the power to "fight fire with fire." *Miranda* provides the safeguard for those suspected of

wrongdoing who are subjected to custodial interrogation.

The maxim "a fool and his money are soon parted" foreshadows the results of decisions

in cases such as *Hoffa v. United States*, 385 U.S. 293 (1966), and *United States v. Whites*, 401

U.S. 745 (1971), which arise from a defendant's misapprehension about the loyalty of the

individual he confides in or invites into an otherwise protected space (such as a home or a hotel

room) shattering one's otherwise protective legitimate expectation of privacy. *See also United

States v. Cruz Jimenez*, 894 F. 2d 1, 5 and n.5 (1st Cir. 1990); *Lewis v. United States*, 385 U.S.

---

[17] Other potential circumstances relevant to the voluntariness question are the defendant's maturity, education, physical condition and mental health, as well as the length of the interrogation and its location. *See Withrow v. Williams*, 507 U.S. 680, 693. (1993).

206 (1966); *Sorrells v. United States*, 287 U.S. 435, 441-442 (1932); *Weatherford v. Bursey*, 429 U.S. 545 (1977) (approving deception by undercover agent posing as a co-defendant; however, accused was neither in custody nor was information from the agent's surreptitious intrusions imparted to those prosecuting Bursey).

## II. THE WARRANTLESS ACQUISUTION OF THE DEFENDANT'S PRIVATE THOUGHTS AND THEIR SUBSEQUENT RECORDING VIOLATED HIS FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES, AS HE HAD A REASONABLE EXPECTATION OF PRIVACY AT THE PLACE AND TIMES WHEN THE GOVERNMENT'S AGENT INTERROGATED HIM.

Gutierrez recognizes that finding a safe harbor in the Massachusetts electronic surveillance statute, M.G.L. c 272, § 99, which prohibits recording an individual without that person's knowledge or consent, is an uphill climb. Under Commonwealth law, the government's recordings would violate the statute and Article 14 of the Massachusetts Declaration of Rights and would be inadmissible in a Massachusetts state court. Here, there was no doubt that the surveillance, despite occurring in a state penal institution was conducted by federal agents for a federal investigation, giving the government more leeway to use the recordings at trial. *United States v. Jarabek*, 726 F.2d 889, 897-900 (1st Cir. 1984). It is noteworthy that, unlike the defendant in *Jarabek*, Gutierrez was in custody at the time of the secret recording and not at liberty to end the interview, as the previous section of this motion makes clear. It is also probative that the Massachusetts requirement that single party consent recordings be authorized by a traditional warrant, issued pursuant to the provisions of M.G.L. c. 276, § 1, *Commonwealth v. Penta*, 423 Mass. 546, 553 (1996), *Commonwealth v. Terzian*, 61 Mass. App. Ct. 739, 742-746 (2004), was also ignored. This entire interaction between Gutierrez and CW-13 occurred at a time when the investigation was under the supervision and direction of state law enforcement and corrections personnel whose purpose was vindication of the murder of Herson Rivas and

punishment of the suspected perpetrators. *Commonwealth v. Martinez*, 87 Mass. App. Ct. 1136 (2015) (discerning the purpose of the investigation in deciding issues of this genre) (citing *Commonwealth v. Gonzalez*, 426 Mass. 312, 317 (1999)).

It is apparent that federal law enforcement agents and members of the federal prosecution team viewed the July 30, 2018, Rivas homicide as an epilogue to *United States v. Recines-Garcia*, which was, as of that time, in its concluding stages. The combination of old-fashioned subterfuge, coupled with electronic wizardry that worked so well in producing Andrade's guilty plea at his Rule 11 hearing on March 20, 2018 (and would provide the government with ample "just desserts" at Andrade's subsequent sentencing on November 5, 2018 (Dkt # 2205, 2215, 2803)), would also be serviceable in striking a decisive blow at this newly coalescing band of Sykos misfits, particularly when one of their number, Gutierrez, struggled intellectually. Moreover, the otherwise required legal groundwork was already in place and had been substantially vetted in the *Recines-Garcia* prosecution of Andrade. (*See* description by the FBI S/A Wood (Dkt # 2034-1; ¶¶13-22)).[18]

The fairy tale-like quality of these "approvals" was obviously lost on the recipients of these "go aheads" from above (*e.g.*, Snow White and the Seven Dwarfs; Walt Disney Productions 1937: *"Mirror, mirror on the wall…"*), in the heat of the moment that also apparently obscured the clear command of the Fourth Amendment:

> An officer may in good faith believe there is ample probable cause to justify a search, but the Constitution requires that decision to be made by a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

*Moran v. Neff*, 415 U.S. 940, 942 (1974) (Douglas, J. dissenting from denial of certiorari) (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

---

[18] The relevant part of this Affidavit appears infra ¶¶ 9-10.

The elaborate "papering" of the file in this case as a prelude to the warrantless reliance on approvals from the Department of Justice's Office of Enforcement Operations serves to demonstrate the government's studied refusal to follow the clearly designated constitutional path to prevent privacy invasions in situations such as the one presented by these facts. The failure to apply to a judicial officer for advance approval to coercively draw out and permanently acquire Gutierrez's private thoughts evidences only the government's utter lack of good faith in selecting the route chosen, to interrogate this defendant – one that is at odds with principles about the protections reserved to "the people" by our Constitution taught as basic civics in high school classes and honed to bedrocks during the first year of law school. *Davis v. United States*, 564 U.S. 229, 236-239 (2011). The substance of these constitutional guarantees, not lip service to and end around them is what distinguishes our system of criminal justice from those of other civilized nations. Neither police, nor investigative or law enforcement officers should be allowed license to erode these fundamentals in the name of expediency.

Decisions of the Court subsequent to *Johnson,* such as *Osborn v. United States*, 385 U.S. 323, 328-31 (1966), have strengthened the viability of adherence to the principle of antecedent justification before a neutral magistrate embodied in the Fourth Amendment. *See Kadis v. United States,* 372 F. 2d 370, 374 (1st Cir. 1967). *Dalia v. United States*, 441 U.S. 238, 247-249 (1979), stands for the proposition that the studied reluctance of law enforcement officers or prosecution teams in situations typified by this case is but a deliberate self-inflicted wound producing evidence of dubious reliability and questionable constitutional validity. This is particularly illustrated by *Dalia,* which demonstrates the flexibility of Article III courts in overseeing efforts to combat crime where the efforts of law enforcement investigators demonstrate an attempt to comply with the commands of the Constitution.

When additional facts showing how the invasion of privacy was actually accomplished by the police and corrections officials in this instance are added to the mix, *i.e.*, "dragooning" Gutierrez from his court-ordered place of detention at Middleton and spiriting him anonymously to Billerica, a correctional facility neither proximate to the offices of his appointed counsel or known to his family in Somerville, Massachusetts, constitutional protections against unreasonable searches and seizures are implicated. To the same effect is *Pagán-González v. Moreno,* 919 F. 3d 582, 591-597 (1st Cir. 2019) (deceptions employed must not prevent a target from making an "essentially free and unrestrained choice to forgo" the protection of the Constitution) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). Deception cannot vitiate the voluntariness of any resulting consent, and the government has the burden to demonstrate that consent was freely and voluntarily given. Mere acquiescence is not free and voluntary consent. "Where there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 548-549 (1968)).[19]

Here, both the initial coerced acquisition of information from Gutierrez by CW-13 and the subsequent, carefully orchestrated return "pass" to secure the warrantless recording of the earlier colloquy with Gutierrez are of questionable constitutional validity. The Fourth Amendment, which applies to warrantless surveillance, electronic or otherwise, *Katz v. United States*, 389 U.S. 347, 353 (1967), hinges on whether the target has a reasonable expectation of privacy in the place to be searched or in the target's "effects" (here, Gutierrez's private thoughts and memories that CW-13 obtained from him through coercion). *Oliver v. United States*, 466 U.S. 170, 182-183 (1984); *Gouled v. United States*, 255 U.S. 298, 304-306 (1921). "[A] search occurs whenever the government intrudes upon any place in which a person has a 'reasonable

---

[19] LaFave: 4 Search & Seizure (6th Ed. 2020) §§8.2(a), 8.2(n); 2 La Fave et al. Criminal Procedure §3.10(c) (4th Ed. 2017).

expectation of privacy.'" *United States v. Bain*, 874 F.3d 1, 12 (1st Cir. 2017) (quoting *Katz*, at 360 (Harlan, J., concurring)).

In general, inmates, whether prisoners serving a sentence or detainees awaiting trial, have a reduced expectation of privacy in a correctional facility. For example, prisoners using the telephone must consent to the recording of their conversations with any party other than their attorneys. *United States v. Footman*, 215 F. 3d 145, 154-155 (1st Cir. 2000).

Within their individual cells, prisoners or detainees have virtually no expectation of privacy and, therefore, no Fourth Amendment protection against unreasonable searches or seizures. *Hudson v. Palmer*, 468 US 517, 526 (1984). Because cells are the primary place where contraband can be effectively hidden in prison, the Supreme Court has held that privacy rights within the cells must give way to the need for institutional security. *Id.*[20] However, the Supreme Court has not held that inmates are without any privacy rights at all in confinement but, rather, "given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of **a diminished scope**." *Bell v. Wolfish*, 441 U.S. 520, 556-557 (1979) (emphasis added) (citing *Lanza v. New York,* 370 U.S. 139, 143-144 (1962)).

Despite the institutional setting, the barbershop at Billerica was a place where Gutierrez had some expectation of privacy, as the room was private, isolated from the other inmates, and deserted at the time of interrogation. CW-13 chose that venue and insisted on interrogating Gutierrez there for precisely those qualities: a quiet, undisturbed and enclosed setting, away from the cells and the busy common areas, would work better for both a full interrogation and for the clarity of the recording, which because of the microphone placement in his shoe would be subject to all manner of ambient noise. Although CW-13's intent was to lure Gutierrez to the

---

[20] As this Court is aware, prison guards recently searched Gutierrez's cell at the Donald W. Wyatt Detention Center in Rhode Island and seized his legal papers in this case, illustrating in real-time the principle that detainees have no recognized expectation of privacy in their cells.

barbershop, Gutierrez clearly relied on the privacy of that setting. *See Bond v. United States*, 529 U.S. 334, n.2 (2000) (stating that a Fourth Amendment violation is contingent on the defendant's privacy expectation, and not the government agent's subjective intent to violate that privacy). That showing of a defendant's reasonable expectation is the first of two factors the Supreme Court has considered when analyzing a potential violation. The second is whether the privacy expectation is one "society is prepared to recognize." *Bain*, 874 F.3d at 12 (quoting *Bond,* 529 U.S. at 338). This factor may seem problematic for Gutierrez, as society may not be prepared to recognize many rights at all for inmates – including detainees who have not been convicting of anything. In fact, the *Hudson* Court's holding, that Fourth Amendment protections do not apply to prisoners in their cells, relied on this societal consideration. *Id.*, 468 US 517, 524-525. But CW-13's interrogation took place in a closed room set up for cutting hair, and that circumstance is far more analogous to a private business than a prison. While barbershops during the day are often busy and portrayed in popular culture as places where patrons regularly gather and exchange gossip (including an entire series of movies with the word "Barbershop" in the title), at night, after closing, they are private spaces where the public is not privy. Society recognizes the privacy right of individuals in a business that has closed its doors to the public for the day.

The absence of prior judicial approval of the government's decision to secretly obtain information and subsequently record that information from Gutierrez, which would have provided some safeguards for Gutierrez's constitutional rights and defined the scope of the interrogation – for which there was none, as CW interrogated Gutierrez about seemingly anything that came to mind – is troubling. Searches and seizures without a warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz.* at 357 (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)

("Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes.")). None of those exceptions apply.

The oral communications comprising the initially unrecorded and then subsequently "Memorexed" colloquies were acquired without prior (or indeed any) judicial approval and violated the privacy safeguards Gutierrez relied upon under the Fourth Amendment. The recordings and any materials derived from them, such as English and Spanish translations, must be excluded from evidence at the trial in this case.

III.    **SURREPTITIOUS TAPING OF THE DEFENDANT, AFTER FIRST COERCING STATEMENTS REGARDING HIS ALLEGED INVOLVEMENT IN RACKETEERING ACTIVITIES, WHEN HE WAS REPRESENTED BY COUNSEL VIOLATED HIS SIXTH AMENDMENT AND ARTICLE 12 RIGHTS.**

The Sixth Amendment guarantees defendants all criminal prosecutions the right to the assistance of counsel. *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). The government may not deliberately elicit incriminating statements from the defendant absent the presence of his counsel or a knowing and voluntary waiver of his right to counsel. *See Massiah v. United States*, 377 U.S. 201,206 (1964). The principle "not only prohibits direct interrogation of a defendant, but more generally prohibits any 'knowing exploitation by the State of an opportunity to confront the accused without counsel being present.'" *Maine v. Moulton*, 474 U.S. 159, 176 (1985). This prohibition applies both to express interrogation, *see e.g.*, *Brewer v. Williams*, 430 U.S. 387, 398-401 (1977), and to surreptitious efforts by the authorities deliberately to elicit incriminating information. *See e.g., United States v. Henry*, 447 U.S. 264, 269-275 (1980) (use of jailhouse informant to elicit admissions from incarcerated defendant); *Massiah*, 377 U.S. at 206-207 (use of informant to elicit admissions from defendant who was released on bail).

> This right to counsel must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse... The relevant inquiry has been stated variously as whether the

28

> authorities deliberately elicited incriminating statements from the
> defendant or deliberately and designed set out to elicit information
> from the defendant or intentionally created a situation likely to
> induce the defendant to make incriminating statements.

*Sweat v. Arkansas*, 469 U.S. 1172, 1178 (1985) (Brennan, J., dissenting) (internal quotations

omitted.).

At the time of CW-13's interrogation, Gutierrez was represented by counsel on his

pending state firearm case, but that attorney was not present for the interrogation because he

obviously was not aware it was taking place. The prohibition against eliciting statements from a

defendant in the absence of counsel exists because any "secret" interrogation of the defendant

without the protection afforded by the presence of counsel, "contravenes the basic dictates of

fairness in the conduct of criminal causes and the fundamental rights of persons charged with

crime." *Massiah*, 377 U.S. at 205 (quoting *People v. Waterman*, 175 N.E.2d 445, 448 (1961)).

The government will almost certainly argue that *Kirby* forecloses Gutierrez's argument

because it specifies that the Sixth Amendment right attaches to a defendant only "at or after the

time that adversary judicial proceedings have been initiated against him." *Kirby,* 406 U.S at 688.

The Court also stated that *Escobedo v. Illinois*, 378 U. S. 478 (1972), seemingly an outlier on this

issue, is not apposite because that case's prime function was "to guarantee full effectuation of the

privilege against self-incrimination," and was limited to its facts. *Id*. at 689 (citing *Johnson v.*

*New Jersey*, 884 U.S. 719, 729 (1966)). However, *Escobedo* requires that counsel be provided,

*inter alia*, when an investigation "is no longer a general inquiry into an unsolved crime but has

begun to focus on a particular suspect," and the suspect is in custody and subjected to

interrogations designed to elicit incriminating statements. *Escobedo*, 378 U.S. at 490-491.

Here, the government had specifically identified Gutierrez as a suspect in the Rivas

homicide prior to his unexplained transfer to Billerica, a fact which appears in the FBI materials

cited above. Gutierrez submits there is a season for everything and that this Circuit has recognized the *Kirby* rule might give way to due process concerns involving "deprivations of life, liberty, or property without fundamental fairness through governmental conduct that offends community sense of justice, decency and fair play." *Roberts v. Maine*, 48 F. 3d 1287, 1291 (1st Cir. 1995). *Boskic*, 545 F. 3d at 81-84, is not to the contrary given Gutierrez's voluntary appearance at the offices of federal investigators and his demonstration that he could answer or refuse to respond to questions posed.

Confessions, *per se*, may be not an evil but an unmitigated good, as *McNeil v. Washington*, 501 U.S. 171, 181 (1991) teaches, but the competitive pressure to obtain them, coupled with the all too convenient and frequent usage of mercenaries (paid in kind, and in discounted criminal judgments but paid nonetheless), and cutting edge technology coupled with duplicity and coercion seriously threatens to swallow the adversary system whole – a questionable good at best.

In *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), the Court applied the *Massiah* test to incriminating statements made to a jailhouse informant:

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation... a defendant does not make out a violation of that right [Sixth Amendment right to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459 (internal citations omitted.

In this case, CW-13 was working for the government and asked specific questions of the defendant which were designed to elicit incriminating answers. Had the defendant's statements been "spontaneously volunteered" or "blurted out" during the conversations, the Sixth

Amendment would not have prevented suppression: "Statements obtained 'by luck or happenstance' do not implicate the Sixth Amendment." *Maine v. Moulton*, 474 U.S. 176. However, CW-13 led the questioning; the defendant's responses were direct and compelled by the coercive nature of the interrogation – they were not spontaneously offered.

Furthermore, CW-13 was instructed to concentrate on incidents for which the defendant was a suspect, particularly the homicide, thereby avoiding the need to wait for a formal investigation, arrest or indictment to proceed. "Deliberate chicanery by the government intended to subvert an accused's Sixth Amendment rights, by delaying formal charges, may give rise to a right to counsel before charges are brought." *United States v. Bartelho*, 120 F.3d 663, 675 (1997). This type of interrogation and intentional deprivation of the defendant's right to counsel violated his Sixth and Fourteenth Amendment rights.

## IV.   THE DEFENDANT WAS ENTITLED TO THE PRESUMPTION OF INNOCENCE UNDER THE DUE PROCESS CLAUSE.

"[U]nder the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt." *Bell v. Wolfish*, 441 U.S. 520, 535-539 (1979). Gutierrez recognizes that after a bail or other pretrial hearing he could lawfully be detained pending trial (and then become subject to a detention facilities' restrictions, regulation and conditions of confinement), so long as those conditions or restrictions did not amount to punishment or otherwise violate the Constitution. *Ford v. Clark*, 746 F. Supp. 2d 273 (D. Mass. 2010); *O'Connor v. Huard*, 117 F.3d 12, 16 (1st Cir. 1997).

Regardless of how Gutierrez may have been viewed by his jailers, law enforcement officers, and state and federal prosecutors, due to his perceived connection to MS-13, he was entitled to far better treatment than what he received during the period of August 1, 2018 – December 1, 2018. He was entitled, at least, to treatment consonant with the lawful U.S.

permanent resident status he enjoyed at the time of his August 1, 2018, arrest by the Peabody Police Department for jointly possessing a firearm without a license. More to the point in this proceeding, he was entitled to the presumption of innocence and the benefits and protections which follow a plea of "not guilty."[21] *Bell,* 441 U.S. at 533; *Pagano v. Allard*, 218 F. Supp.2d 26, 34-35 (D. Mass. 2002) (describing the presumption of innocence as "a proxy for the reasonable doubt standard," which protects "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.") (citing *In Re Winship*, 397 U.S. 358, 364 (1970)).[22]

From his initial arrest on August 1, 2018, to his November 28, 2018, initial appearance in this Court, Gutierrez's presumption of innocence and his right to due process of law (as the values in that phrase are animated by the provisions of the Fourth, Fifth, Sixth and Fourteenth Amendments) were wholly disregarded in favor of treatment of the defendant as little better than a farm animal. As in *Roberts v. Maine*, 48 F. 3d at 1291-1292, the combination of circumstances visited upon Gutierrez by agents of the government during his detention in custody pending trial failed to meet the requirements of fundamental fairness. In their mistreatment of Gutierrez while in their custody the agents of the state and/or federal government (or the players on the prosecution team) "crossed the constitutionally significant divide from fact-finder to adversary." *United States v. Larkin*, 978 F. 2d 964, 969 (7th Cir. 1992) (quoting *Hall v. Lane*, 804 F.2d 79, 82 (7th Cir. 1986).

---

[21] No claim is made here that constitutional due process was not provided Gutierrez at proceedings in the Peabody District Court or the Essex Superior Court. However, like the apocryphal "baby discarded with the bath water," these minimal constitutional benefits and protections due him not only evaporated but were consciously disregarded by those in whose custody he was remanded pending trial. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975); *Stack v. Boyle*, 342 U.S. 1, 5 (1951); 18 U.S.C. § 3146, § 3148.

[22] *Bell v. Wolfish*, 441 U.S. at 533, notes that the presumption of innocence doctrine guarantees a detainee constitutional due process rights, in that he will not be punished prior to a guilty verdict or plea.

Here, the prosecution team's scheming resulted in a coerced confession by Gutierrez, "probably the most probative and damaging evidence that can be admitted against him." *Cruz v. New York*, 481 U.S. 186, 195 (1987) (quoting *Bruton v. United States*, 391 U.S. 123, 139-140 (1968) (White dissenting)). As Justice White noted in *Bruton*, a jury cannot be expected to ignore a coerced confession even if directed by the court to do so. *Id.* (*cited by Fulminante*, 499 U.S. at 292 (separate section of opinion of Court by White for himself Marshall, Stevens and Blackmun)).[23] The significance of the end result of this craftiness in confining Gutierrez and then, without notice to counsel, relocating him to another facility out of county, can be seen in Justice Jackson's observation in *Watts v. Indiana*, 338 U.S. 49, 59 (1949): "[A] any lawyer worth his salt will tell the [client] in no uncertain terms to make no statement to police under any circumstances." *See also In Re Grand Jury Proceedings*, 814 F. 2d 791, 794-795 (1st Cir. 1987).

Here, Gutierrez was summarily removed from his designated place of confinement: without approval by the Peabody District Court Judge, whose order resulted in issuance of the mittimus,[24] without notice to Gutierrez's state court counsel or his family, and; without his property fund.[25] Gutierrez, through undersigned counsel, requested evidence of compliance with

---

[23] Justice Kennedy neither wrote nor joined an opinion of another justice. He concurred in the judgment providing the required fifth vote.

[24]     The Mittimus of August 2018 issued by the Peabody District Court was directed toward "the Official In Charge Of: Essex County House of Correction," and stated:

> The Court has ORDERED that the defendant named above be committed to the above institution, held as a pretrial detainee without bail, and there await his or her next court appearance at the court location indicated above.

> And duly authorized officer is hereby ORDERED to convey and deliver the defendant safety to such institution, and to make return thereon. The official in charge of such institution is hereby ORDERED to receive the defendant into custody, to keep the defendant safely, and to return the defendant to the court indicated above on the date and time of next event indicated above, unless the defendant is otherwise legally discharged before such date.

[25]      In sum, while Gutierrez's facility transfer was superficially of the type corrections officials are permitted to accomplish with convicted prisoners (M.G.L. c. 127, § 97); *Riley v. O'Brien*, 16-11064-LTS, 2016 BL368255*3, 2016 WL 6562113 (D. Mass. Nov. 3, 2018). Gutierrez status was that of a "pretrial detainee," whose movement is

M.G.L. c. 276, § 52A, both from authorities at the relevant correctional facilities and from the prosecutor in this case, all to no avail.[26] None has yet been produced.

What has occurred here quite plainly and simply is fraud. Deliberate chicanery is far too genteel a descriptive phrase. It may be fraud committed not for personal gain but employed for the perceived best of reasons – but it is fraud nevertheless. To substitute disguise and deception as devices to obtain information from a transplanted detainee oblivious to the fact he is, in fact, conversing with a government operative (admittedly not a sworn officer acting in the performance of his duty while aspiring to a career in law enforcement but rather an accused scallywag looking to score his "own get out of jail free" card), is to elevate form over substance. It may be an improvement from the perspective of the evidence presenter, it is most certainly not from the perspective of the object of the deception – the defendant. This Court, as the instructor on the values embodied in the Constitution and from its wider and larger perspective is surely aware of the corrosive effect of such practice. *See Olmstead v. United States*, 277 U.S. 438, 485 (1928) (cited by *United States v. Archer*, 486 F. 2d 670, 674-675 (2d Cir. 1973)):

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means--to

---

governed by the provisions of M.G.L. c. 276, § 52A. *See MacDougall v. Commonwealth*, 447 Mass. 505, 508 (2006).

Interestingly, *Commonwealth v. Foxworth*, 473 Mass. 149, 153-154 (2015), which dealt with a defendant's unsuccessful attempt to suppress admissions made to a jail mate under circumstances somewhat similar to those present here, had one significant difference. In *Foxworth*, the reporting jail mate had no preexisting agreement with the government, as did CW-13 in this case, and was instead an "informant at large," acting on an entrepreneurial but unencouraged hope to curry favor. He was not the government agent that CW-13 was.

[26] Letter of October 21, 2019, email of January 23, 2020 (attached herein at **Exhibit "L").**

declare that the government may commit crimes in order to secure the conviction of a private criminal--would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.[27]

## V.      THE RECORDINGS AND THEIR TRANSLATIONS ARE INADMISSIBLE HEARSAY.

The government appears to be laying the entire foundation of its case with the recordings CW-13 made of his alleged conversations in detention with Gutierrez. As such, the tapes and their English translations, which the government will surely move to enter into evidence at trial, will be offered for the truth of the matter asserted, *i.e.*, that the declarant, Gutierrez, admitted to the allegations regarding the 2018 killing of Herson Rivas, cited as a racketeering act in the Superseding Indictment. The recordings serve no other purpose in this case. Therefore, that evidence conflicts with the hearsay exceptions outlined in *Crawford v. Washington*, 541 U.S. at 59 n. 9 (2004) (Confrontation Clause bars the use of "testimonial statements" offered to "establish[] the truth of the matter asserted.").[28]

Under other circumstances, such hearsay could be allowed in under the co-conspirator exception, Fed.R.Evid. 801(d)(3)(E), if the statements were made at the time the two were involved in a conspiracy and the statement furthered the conspiracy. *United States v. Murphy*, 852 F. 2d 1, 8 (1st Cir.1988) (*United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)). However, Gutierrez and CW-13 were not co-conspirators, and at the time of the alleged statements, the alleged conspiracy itself would have been over, as all the codefendant in this case

---

[27] *Archer* does note that Justice Brandeis' view, while eloquently stated, has never commanded the support of a majority of the Supreme Court. It is cited to this Court as probative and because there is a season for everything.

[28]      Co-defendants Eliseo Vaquerano Canas, Jonathan Tercero Yanes, and Djavier Duggins have filed motions to exclude the statements on the recordings as inadmissible hearsay (Canas and Yanes filed a "Joint Motion *in Limine* to Exclude Statements Made By Salvador-Gutierrez to CW-13," on  (Dkt # 359) under seal, and Duggins filed his "Motion in Limine to Preclude Hearsay Testimony of Alleged Coconspirators Made to Government Agents With No Available Hearsay Exception Under F.R.E. 801(d)(2)(E)," on September 24, 2020 (Dkt  # 334)). Gutierrez moves to join the motion filed by Canas and Yanes and incorporate all of the arguments contained herein by reference.

were detained. Compare *United States v. Aviles-Colon*, 536 F. 3d 1, 22 (1st Cir. 2008) (not abuse of discretion to admit Spanish-language recordings and their English translations where the declarant and defendant had previously been coconspirators, and declarant testified as to his personal knowledge of the gang, including internal conflicts and future plans known at the time of the recording).

Further, the information contained on the tapes, the statements allegedly made by Gutierrez himself, were made under coercion. *See* Section I, *infra*. That, in and of itself, renders the statements unreliable and inadmissible. The recording and their written translations are out-of-court statements that meet no hearsay exception. As such, they were inadmissible. As for CW-13, even had he not coerced the statements, he has no personal knowledge of Gutierrez's involvement or culpability, if any, in the charges leveled against Gutierrez in the Superseding Indictment case and therefore cannot be allowed to be a witness at trial.

## CONCLUSION

For the reasons stated above, the recordings made by the government's agent CW-13 are inadmissible at trial, as are their transcriptions. The statements they purport to contain were acquired by government covert action that was coercive and in direct violation to the U.S. Constitution. The First Circuit has cautioned, "[f]ederal courts must be careful not to sanction intentional unlawful conduct by law enforcement officers." *Jarabek*, 726 F. 2d at 900, n.10. A favorable decision for the government here would do precisely that: sanction deliberate chicanery that violated the defendant's constitutional rights, *inter alia*, to privacy, unreasonable search and seizure, due process, assistance of counsel, and the prohibition against forced self-incrimination.

Respectfully submitted,

HENRI SALVADOR GUTIERREZ,
By his attorney,

/s/   *George F. Gormley*
George F. Gormley (BBO# 204140)
George F. Gormley, P.C.
160 Old Derby Street, Suite 456
Hingham, MA 02043
Tel: 617 268-2999/Fax: 617 268-2911

Dated: December 1, 2020

### CERTIFICATE OF SERVICE

I, George F. Gormley, certify that I understand that all counsel will receive electronic notice of the electronic filing of this pleading.

/s/ *George F. Gormley*
George F. Gormley