# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | **)** | **Crim. No.  18-10450-MLW** |
| | ) | |
| **HENRI SALVADOR GUTIERREZ** | ) | |

## DEFENDANT'S RESPONSE TO COURT ORDER
## REGARDING IN-PERSON MOTION HEARINGS

Counsel for the defendant, Henri Salvador Gutierrez, hereby responds to this Court's February 18, 2021, order regarding his continued objection to holding the upcoming evidentiary hearing on the Motion to Suppress via videoconference ("Zoom"). This Court has asked the remaining defendants in the above-named case to address whether they have "a right to have the hearing conducted in the courtroom." Order, Feb. 18, 2021, at 1.

It is counsel's belief that by framing the issue in this manner, and pairing it with a citation to *United States v. Mitchell-Hunter*, 663 F. 3d 45, 51 (1st Cir. 2011), this Court is asking whether this question can be answered via the Confrontation Clause, which states "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." *Id.* (quoting U.S. Const. amend. VI). However, as this Court knows, the First Circuit held in *Mitchell-Hunter* that the right to confront an accuser applies exclusively to a trial. *Id.*, 663 F. 3d at 51 (citing, *inter alia*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 54 n. 10 (1987) (opinion of Powell, J.), and *California v. Green*, 399 U.S. 149, 157 (1970)). More to the point, the appellate court cited *McCray v. Illinois*, 386 U.S. 300, 313-14 (1967) and *United States ex*

1

*rel. Smith v. Pate*, 305 F. Supp. 225, 227 (N.D. Ill. 1969), for the proposition that the Confrontation Clause right does not apply to suppression hearings. *Mitchell-Hunter*, 663 F. 3d at 52. Arguably, those cases do not actually say that because the issue in each was whether the prosecution had an obligation to produce a confidential informant at the suppression hearing. In each case, a trusted confidential informant told the police that the defendant had sold him drugs, information on which the police acted to stop and search the defendant (or his home, via a warrant), resulting in the seizure of illegal drugs. The courts held that the prosecution was not compelled to produce or even identify the confidential informants, as neither was a material witness to the defendants' guilt or innocence of the charges, whereas the arresting officers were. *McCray*, 386 U.S. at 313 ("The arresting officers…testified, in open court, fully and in precise detail as to what the informer told them and as to why they had reason to believe his information was trustworthy. Each officer was under oath. Each was subjected to searching cross-examination."); *Smith*, 305 F. Supp. at 227 (state court's holding in *People v. Smith*, 241 N.E.2d 185 (Ill. 1968), did not violate petitioner's constitutional rights, as it conformed with "enunciated federal standards concerning the 'informer's privilege'").

Although those cases are distinguishable by their facts – CW-13, while not a material witness to the charges in this case, has already been identified and is the only government witness who can speak to the coercion issue at the heart of the suppression hearing – Gutierrez is faced with the same conundrum as the defendant in *Mitchell-Hunter*: He is hard-pressed to "point to a single case extending the right to confrontation beyond the context of trial," especially in light of the many decisions denying that right at other phases of the prosecution. *Mitchell-Hunter*, 663 F. 3d at 51-52. As those courts' rulings are rather firm as to "when" the

2

Confrontation Clause applies, counsel suggests that the more relevant question for this case is "where." Should Gutierrez and the other defendants be allowed to face CW-13 in the same room? Even if this Court agrees there is no constitutional right to confront an accuser at a suppression hearing, that does not preclude the Court from conducting the motion hearing in the courtroom, where counsel suggests the interests of justice would be far better served than if the hearing is held on Zoom.

There is no doubt that Zoom conferences have been something of a godsend, as they have allowed many types of "face-to-face" communications to continue throughout the coronavirus pandemic. However, there should also be no doubt they cannot replace all the benefits of in-person, contemporaneous meetings. If video could replace and adequately reproduce all such experiences, the Boston Red Sox would never sell another ticket to any fan owning a television and a NESN subscription.

There are far too many things that can occur in these situations which the camera does not adequately capture, even when the camera is directly trained on the subject in question. The upcoming hearing on Gutierrez's motion will involve complex communications between multiple parties, as does every court hearing, and those will be strained by the limitations of Zoom. The most important aspect of the hearing will be this Court's ability to assess the credibility of both CW-13, a killer and veteran MS-13 member who is attempting to use his secret taping of Gutierrez as his permanent ticket out of prison, and Gutierrez, who feared repercussions against himself and his family and friends if he did not talk to CW-13. Courts look to a number of factors when evaluating witness credibility that go beyond the person's testimony. It is not just what the witnesses say but how they say it, and the body language they

3

employ – their mannerisms, behavior and demeanor – while they are on the stand.

Admittedly, the caselaw on this issue, at least what there is of it at this juncture, leans heavily toward judges expressing confidence that after a year of court business on Zoom they have no problem evaluating credibility. As a federal judge in Wisconsin recently noted, "I have routinely employed Zoom to conduct contested evidentiary hearings where witness credibility was at issue. Although the experience is different from being in a courtroom, it is not less accurate…the instantaneous transmission of video testimony permits the Court and counsel to view a witness live, along with his hesitation, his doubts, his variations of language, his confidence or precipitancy, and his calmness or consideration." *Greystone Condominium Association, Inc. v. Amguard Insurance Co*., No. 19-cv-768 (W.D. Wis. 2021) (citing *Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n*, 470 F. Supp. 3d 735, 743 (E.D. Mich. 2020), *In re RFC & ResCap Liquidating Trust Action*, 444 F. Supp. 3d 967, 970 (D. Minn. Mar. 13, 2020)) (internal quotation marks omitted). *See also F.T.C. v. Swedish Match North America, Inc*., 197 F.R.D. 1, *2 (D.D.C. 2000) (stating "there is no practical difference between live testimony and contemporaneous video transmission").

While counsel appreciates the "we got this" attitude those courts proclaimed in their civil cases, their rulings do not fully resolve the concern that too many crucial aspects of body language are hidden from the camera's view. "Empirical evidence has shown that when we communicate, we use words (or verbal forms) about 7% of the time and nonverbal forms 93% of the time." *People v. Saiz*, 32 P.3d 441, 454 (Colo. 2001) (citing Albert Mehrabian, *Communication Without Words*, PSYCHOL. TODAY, Sept. 1968, at 53). It may be amusing to know that Bob has been participating in his company's weekly Zoom conferences wearing a tie

but also shorts or sweatpants just below the frame, but it is much more serious if the government's witness in a criminal proceeding is seen on Zoom smiling and calm, but is also fidgeting and nervously bouncing his knee off camera. These nonverbal actions are also important forms of communication, and the fact they are almost entirely lost on Zoom should raise some concern:

> Tone of voice, what someone is doing with their hands or legs, at whom or where that person is looking during their testimony – all of that factors into nonverbal communication. In the courtroom, jurors are not only watching the person speaking or testifying. They are watching the parties' reactions to the testimony and evidence. In focus groups and post-verdict interviews, the authors routinely hear jurors tell them that nonverbal cues were just as important as testimony. In Zoom, the jury can hear the witness, but they only get the benefit of tone of voice, facial expressions, or if the witness is looking down or off camera. But from the neck down the jury has no concept of what the witness is doing. Zoom takes the ability to see nonverbal communication away from the jury.

Robert Hirschhorn, et. al., *Zoom Jury Trials: The Idea Vastly Exceeds the Technology*, available at https://www.law.com/texaslawyer/2020/09/29/zoom-jury-trials-the-idea-vastly-exceeds-the-technology/?slreturn=20210218155553.

Further, a U.S. Department of Justice-funded study in 2015 found that "some video-conferencing technology uses a middle bandwidth filter that cuts off low and high voice frequencies, which are typically used to transmit emotion. This feature removes critical emotional cues that can be used by judicial officers to determine a defendant's remorse and character." Robin Davis, et. al., *Research on Videoconferencing at Post-Arraignment Release Hearings: Phase I Final Report*, NCJ Number 248902, at 5-6, available at https://www.ojp.gov/pdffiles1/nij/grants/248902.pdf. Although counsel does not know if Zoom uses a limited audio

bandwidth, the larger point is that videoconferencing can have a dehumanizing effect that hinders credibility assessment in ways which the trier of fact may not even realize.

The ability to provide effective advocacy is also in question, particularly at those times when counsel and client need to confer and the break-out room option is not necessarily the answer. "Even more troublesome [is] the inability for the client to communicate with her own lawyers. During a regular trial, a client can ask questions, pass notes during prosecution witness testimony, or otherwise communicate with counsel…no one will deny that clients have the right to speak with their own lawyers during trial proceedings. Zoom makes this impossible." *Zoom Jury Trials*, *supra*. When CW-13 is on the stand, it will be imperative for counsel to get Gutierrez's reactions and responses in real time in order to conduct an effective cross-examination. This circumstance would be cumbersome enough in the courtroom considering the necessity of an interpreter to translate those communications, along with the need to conduct these communications quietly without distracting the Court. On Zoom, it will not be possible. Counsel certainly anticipates conferring with Gutierrez in a break-out room after CW-13's direct examination, and although that conversation is likely to be lengthy inevitably something will be missed: something that could have gone to CW-13's credibility and, under normal circumstances, Gutierrez would have alerted counsel to it the moment CW-13 spoke it. On Zoom, Gutierrez's only realistic option when he hears testimony he knows to be untrue, aside from trying to remember it for later when he has the chance to privately confer with counsel, is to wave his hands wildly on camera until the Court notices and halts the direct examination. Counsel posits that this situation would be untenable.

Similarly, when Gutierrez is testifying on cross-exam, the government is likely to ask him any number of questions designed to elicit a response that could unintentionally signal a waiver of his Fifth Amendment right against self-incrimination.[1] As it is with many criminal-case defendants Gutierrez does not display the level of awareness and sophistication needed to handle himself in court under these conditions without counsel's assistance. Counsel can – and certainly will – object to such questioning, but it may be necessary to get Gutierrez's attention before an objection is necessary. In the courtroom, this can be done discreetly. On Zoom, nothing can be done discreetly.

Finally, security should also be a concern for determining this issue, especially considering that the government has sought a protective order for almost all of the discovery in this case in order to protect its confidential witnesses' identities. While Zoom has some privacy protections built in these are certainly not failsafe, particularly because Zoom conferences are conducted over the Internet, which means they are susceptible to hacking even when secure transmission methods are employed. "Zoom has also had major security flaws, including default settings that didn't include meeting passwords (a problem the company has now fixed) and a misleading definition of end-to-end encryption. (The company claimed meetings were end-to-end encrypted; they are not.)." Zoe Schiffer, *The Jury Is Still Out on Zoom Trials,* April 22, 2020, available at https://www.theverge.com/2020/4/22/21230022/jury-zoom-trials-court-hearings-justice-system-virtual-transparency.

---

[1] Counsel will, of course, request immunity for Gutierrez's testimony at the hearing, per *Simmons v. United States*, 390 U.S. 377, 389-394 (1968) (excluding defendant's suppression hearing testimony from subsequent trial). *See also United States v. Salemme*, 985 F. Supp. 2d 197, 202-204 (D.Mass. 1997). As the suppression hearing is in response to counsel's motion, counsel intends to keep the hearing focused on the salient issue, which is not what Gutierrez said but why he said it.

If the hearing will be open to the public and livestreamed, this point is not necessarily moot. "An additional concern with live-streaming trial proceedings is there is no guarantee that someone is not recording the trial. Somebody cannot walk into a courtroom and videotape the trial without the court's authorization. The court does not have that kind of control over the internet." *Zoom Jury Trials*, *supra*. The concern here is that the hearing can be viewed by any number of individuals on the internet, and even though the court can ask the individuals who connect by video or phone who they are – and the phone numbers can give some indication as to the callers' identities and where they are from – a video of the proceeding can be easily shared with anyone with internet access. *Id. See also* Lauren Kirchner, *How Fair is Zoom Justice*, available at https://themarkup.org/coronavirus/2020/06/09/how-fair-is-zoom-justice (discussing numerous privacy concerns regarding personal information shared by witnesses and potential jurors during live-streamed court proceedings). While the government may struggle to keep CW-13's identity completely secret, a Herculean task in and of itself, a digital recording of him testifying against Gutierrez and the other defendants would be well beyond the court's ability to control: such a recording would almost certainly find its way onto the computers and smartphones of the very people the government is trying to protect CW-13 from.

Nothing in this memorandum is meant to minimize the very real concern about COVID-19. Although undersigned counsel has been vaccinated and, by the time of the hearing, others who need to appear in the courtroom will likely have been vaccinated also, counsel is aware that there will still be those, including possibly Gutierrez, CW-13, and the other defendants, who have not received the vaccine. The logistical concerns are real, even with masks and social distancing. Counsel understands the scenario he described above, with Gutierrez sitting at

8

counsel's table and conferring with an interpreter regarding CW-13's direct examination, presents problems of its own, starting with the need for an interpreter who is willing to be there and can communicate with Gutierrez and counsel in loud enough tones to be heard from six feet away but soft enough so as not to be heard by anyone else in the courtroom. No solution for conducting business during the pandemic is ideal for there is always a risk, but there are trials being conducted in federal courthouses, including the Moakley Courthouse. It can happen safely, but when it occurs and where is, of course, "left to the sound discretion of the district court." *United States v. Brown*, 621 F.3d 48, 57 (1st Cir. 2010) (citing *United States v. Calderon*, 77 F.3d 6, 9 (1st Cir.1996)).

As to the issue of whether the statements made during the surreptitious taping of Gutierrez are testimonial, counsel restates his view that the evidence conflicts with the hearsay exceptions outlined in *Crawford v. Washington*, 541 U.S. at 59 n. 9 (2004) (Confrontation Clause bars the use of "testimonial statements" offered to "establish[] the truth of the matter asserted."). It is clear that the government intends to offer the taped conversations at trial for truth of the matter asserted, *i.e.*, that the declarant, Gutierrez, admitted to the allegations regarding the 2018 killing of Herson Rivas, cited as a racketeering act in the Superseding Indictment. The recordings serve no other purpose.

As Gutierrez has previously argued, he and CW-13 were never co-conspirators, not at the time of the alleged statements nor at any time previously. They had not even met before their brief time together at Billerica. CW-13, according to the government, had ended his association with MS-13 by the time he met Gutierrez, effectively withdrawing from any tenuous conspiracy ties the two might have shared by allegedly belonging to the same international gang. The First

9

Circuit has "made manifest that in order to withdraw from a conspiracy, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy." *United States v. Piper*, 298 F. 3d 47, 53 (1st Cir. 2002) (citing *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir.1987) (*per curiam*)) (internal quotation marks omitted). "[A] full confession to authorities" meets this requirement, *id*., which CW-13 did when he signed a cooperation agreement and met with the government during several proffer sessions, including a meeting at the U.S. Attorney's Office the day prior to taping Gutierrez.

Counsel understands that an informant who is often a government agent, as CW-13 was, is not in a conspiracy with the target of the surveillance. *Piper*, 298 F. 3d at 53 ("The black-letter principle is that statements made in the course of a discussion between a coconspirator and a third party who is a stranger to the conspiracy are admissible under Rule 801(d)(2)(E), provided that they meet the Rule's foundational requirements."). Although the alleged conspiracy does not need to exist between the declarant and the third party, the statements must also further the existing conspiracy in some way. *Id.* ("coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy.") (citing *United States v. Fahey*, 769 F.2d 829, 839 (1st Cir.1985)). The statements on the tape must "advance the goals of the conspiracy in some way." *United States v. Martinez-Medina*, 279 F.3d 105, 117 (1st Cir.), *cert. denied*, 122 S.Ct. 2608, 153 L.Ed.2d 794 (2002). Gutierrez was incarcerated at the time of the taped conversations and separated from his codefendants. His statements to CW-13, involving past events, not future plans, and which can best be described as "boasting" and "braggadocio" about those past events, are unreliable elements often present in jailhouse discussions. *See United States v. Connolly*, 504 F. 3d 206,

215 (1st Cir. 2007). The statements cannot reasonably be determined to advance or promote the object of some ongoing conspiracy.

As to their admissibility against coconspirators under Fed. R. Evid. 804(b)(3), Gutierrez reemphasizes the main points in his previously filed response with this Court regarding whether the statements are admissible against him as statements against interest: Gutierrez is arguably not the reasonable person the first prong of the exception envisions, considering his documented history with reduced mental capacity, and the information on the tapes is the product of coercion. They are no more admissible than confessions made to law enforcement agents who are not undercover (as CW-13 was) but who have threatened – either overtly or through clear implication – physical violence against the defendant and, in some cases, the defendant's family members and close friends.

<u>Conclusion</u>

In the interests of justice, this Court should hold the hearing on Gutierrez's motion to suppress in the courtroom where the Court can adequately observe the witnesses to determine their credibility. Further, this Court should find that the surreptitiously recorded statements of Gutierrez by CW-13 are hearsay inadmissible against Gutierrez or his codefendants under any hearsay exception.

Respectfully submitted,

/s/   *George F. Gormley*

George F. Gormley (BBO# 204140)
George F. Gormley, P.C.
160 Old Derby Street, Suite 456
Hingham, MA 02043
Tel: 617 268-2999/Fax: 617 268-2911

Dated: March 25, 2021

<u>**CERTIFICATE OF SERVICE**</u>

    I, George F. Gormley, certify that I understand that counsel for the government will receive electronic notice of the electronic filing of this pleading.

/s/  *George F. Gormley*
George F. Gormley

12