## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.  18-10450-MLW** |
| | ) | |
| **HENRI SALVADOR GUTIERREZ** | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, HENRI SALVADOR GUTIERREZ (herein "Salvador"), hereby submits the following memorandum for the Court's consideration at sentencing.

**I       INTRODUCTION**

"Each of us is more than the worst thing we've ever done."

Attorney Bryan Stevenson wrote those words in connection with his book "Just Mercy," which recounted his experiences working on behalf of death row prisoners in the Deep South. Although "Just Mercy" famously centered on Stevenson's exoneration of one particular inmate, Walter McMillan, who had been sentenced to die in Alabama for a murder he did not commit, other men Stevenson represented were not innocent. They were murderers and some of their crimes were truly heinous acts of brutality. It would have been understandable for Stevenson to be personally repulsed by what they had done, perhaps even to a degree where his discomfort compromised his willingness to represent their interests. That was not his reaction, however, as Stevenson managed to find the humanity in every one of them, precisely because he kept the above sentiment in mind. He knew there was more to these men than the crimes they had

1

committed; that they deserved justice and mercy, even if they had shown little mercy in taking the lives of others.

Like those men in Stevenson's book – and unlike McMillan or others who had been "railroaded" by an unjust system – Salvador is not innocent. He willingly participated in two murders of two young men, and the government has argued he did it because of an unwavering allegiance to a criminal enterprise that demanded such violence. The natural tendency here would be to lock him up and throw away the key. Certainly, the Presentence Report ("PSR") has put Salvador on that path, calculating his total offense level under the advisory U.S. Sentencing Guidelines at 43. That is the very end of the Guidelines' Sentencing Table, at which there is no "range" of potential sentences, only life in prison. The government agrees with that assessment, finding no reason for this Court to find otherwise.

The worst thing Salvador has done is horrible: he took part in ending the lives of two men and permanently deprived their families of those they loved. It is difficult to see Salvador as anything but those actions. But he is more than that, and because he is not the irredeemable monster his crimes portend there are other viable and defensible options before this Court in lieu of sending Salvador to prison for life.

## II.    ARGUMENT

### A. The Guidelines Calculation

The facts of this case have been well-documented and litigated to a great extent in the filings, both by the government and Salvador, and will not be repeated in their entirety here. Salvador's objections to the Presentence Report ("PSR") also will not be repeated in their entirety, although some points need to be restated as they may directly impact how this Court

2

proceeds with its task of determining a just punishment, considering all the factors which federal law directs at sentencing. *See* 18 U.S.C. § 3553(a)(1) (history and characteristics of the defendant, along with the nature and circumstances of the offense, and the applicable U.S. Sentencing Guideline ranges and provisions, including commentaries, are among the relevant factors a court can consider in fashioning a sentence that is not longer than necessary to achieve the goals of sentencing). However, "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).

Under the PSR as originally drafted there would be no further discussion needed and no consideration of the "tapestry of factors" *id.*, would be necessary. The U.S. Probation Office's Guidelines calculation puts Salvador at a total offense level of 43 (actually 44, but the Guidelines' sentencing table goes no higher than 43) (PSR ¶ 171). At that level the only advisory sentence, regardless of the defendant's criminal history, is life. There are no advisory guidelines sentencing ranges ("GSR") to ponder.

However, as noted in Salvador's objections to the PSR, Salvador believes his Guidelines calculation contains an error which significantly affects the outcome. The PSR enhances his total offense level by two for a role in the offense adjustment, pursuant to U.S.S.G. § 3B1.4. for the use or attempted use of a minor in committing, or assisting in avoiding detection of, or apprehension for, the murder of Herson Rivas. (PSR ¶ 155). The juvenile in question, Maynor Maltez Romero, was not included as a codefendant in the case at bar but was charged separately in *United States v. Romero*, Crim. No. 18-10446-PBS, for violating the RICO statute. (*See* PSR ¶ 11). It should be noted that the government moved to prosecute Romero as an adult

and that Romero did not oppose that motion, waiving his due process rights to a juvenile

delinquency and transfer hearing. Also, by all accounts, Romero – who the others referred to as

"Corrupto" – voluntarily participated in the Rivas murder and needed no encouragement from

anyone.

Salvador did not "use" Romero or any other person in this case. Salvador was not a

leader and he did not encourage, intimidate, counsel, train, procure, recruit, or solicit Romero's

participation in the killing. Compare *United States v. Castro*, Crim. No. 15-10338-FDS

(defendant was reputed to be the leader of the MS-13 "East Coast Program," which actively

recruited juveniles for membership). The PSR does not contain any evidence showing Salvador

having any particular influence over any other member of his group, the "Sykos Locos

Salvatrucha". The only "evidence" here of even rudimentary communication between Salvador

and Romero during the killing was contained in the government's transcript of the secret

recording CW-13 made while he interrogated Salvador, who was without the aid of counsel,

while both were in custody.[1]CW-13 had made a number of statements to the government

According to the transcript, Salvador told CW-13 that when the attack began he was looking in a

backpack, allegedly for a knife, and asked Romero/"Corrupto," who was standing next to

Salvador, where it was. The response from Romero was something to the effect of 'it's right

there, take it.' As this Court well knows, Salvador challenged the admissibility of the recordings,

not only for constitutionally-suspect method in which they were made but also for reliability of

---

[1] In the initial investigation, CW-13 told the government during his proffer sessions that Salvador
made a number of admissions to CW-13 while they were both in the Middlesex County House of
Correction. The government outfitted CW-13 with a hidden recorder with instructions to go back
and get Salvador to make those admissions on tape.

what was said. Jailhouse boasting is not uncommon, and the presence of puffery between a young inmate trying to impress an intimidating, older MS-13 member with a history of violence should not be surprising.

But even if the incident occurred exactly as the transcript stated, Salvador asking Romero what happened to something he thought was in a backpack because Romero is literally standing next to the backpack does not "use" or "attempt to use" him in commission of the crime. Compare *United States v. Corbett*, 870 F. 3d 21, 31-32 (1st Cir. 2017) (defendant recruited underage girl to sell drugs for him in trafficking conspiracy); *United States v. Acosta*, 534 F.3d 574, 588 (7th Cir. 2008) ("Distributing drugs directly to minors for further distribution qualifies as the type of personal use of a minor warranting application of the use-of-a-minor enhancement under § 3B1.4."); *United States v. Garcia*, 497 F.3d 964, 971 (9th Cir. 2007) (upholding enhancement where defendant supplied minor with methamphetamine to sell).

In the context of this enhancement, the word "'use' requires a showing of more than a mere criminal partnership." *United States v. Butler*, 207 F. 3d 839, 849 (6th Cir. 2000). Had Salvador found the knife and given it to Romero, so that Romero could attack Rivas, or had he encouraged or ordered Romero to get involved, because Salvador was slightly older, this enhancement may have been appropriate. But Salvador took no such affirmative action, and even the transcript indicates he did not interact with Romero in any way after merely asking the question. *See United States v. Parker*, 241 F. 3d 1114, 1120-21 (9th Cir. 2001) (no enhancement where defendant did not act "affirmatively to involve the minor in the robbery, beyond merely acting as his partner."). Further, there is no indication there was an unbalanced power dynamic between the two because of their ages. If anything, Salvador would have been the junior

member, having joined the Sykos Locos only a few weeks earlier. And in the Rivas murder, they

were on equal footing. *Butler*, 207 F. 3d at n.3 (no enhancement where "[t]he facts, at best, show

only that [the adult defendant and underage partner] possessed equal authority in their

commission of the crime.").

As the *Parker* Court held, subjecting adult co-conspirators to the enhancement if a minor

was involved "in any way… is at odds with both the plain meaning of the statute and the

advisory note, which clearly implies that only actions affirmatively taken to involve a minor in

the offense will qualify under § 3B1.4. If Congress meant to punish persons who committed an

offense that in any way *involved* a minor, it would have provided so explicitly instead of

employing the 'used or attempted to use' language." 241 F. 3d at 1121 (emphasis in original).

*See also United States v. Paine*, 407 F.3d 958, 965 (8th Cir. 2005) ("[T]he defendant must

affirmatively involve or incorporate the minor into the commission of the offense."). There is no

evidence Salvador actively incorporated Romero into the attack, or that they were anything but

co-conspirators. The enhancement, therefore, is inappropriate, and cannot justifiably be applied.

This is a critical point because unlike Salvador's codefendants, Salvador already gets an

additional two-level increase because of the Luis Orellano Ruano killing, (PSR ¶¶ 164-166),

which the Guidelines considers a separate "group." *See* U.S.S.G. § 3D1.4(a-c). That raises his

base offense level from 43 to 45, and the enhancement for use of a minor raises the total offense

level to 47, a point where even the three-level reduction for pleading guilty will not bring his

GSR below life in prison. Although the Guidelines are advisory and are only one of the factors a

sentencing court must consider, *United States v. Clogston*, 662 F.3d 588, 591 (1st Cir. 2011),

*Kimbrough v. United States,* 552 U.S. 85, 91 (2007), it would be naïve to believe that in practice

they are not a significant or even primary factor at sentencing. Forgoing this enhancement would put Salvador's offense level at 45, and the three-level reduction for accepting responsibility would lower that to 42 where the GSR (for all criminal history categories) is 360 months to life. That is the appropriate range within which this Court should impose sentence, as it will provide a serious level of punishment that will accomplish the sentencing goals of 18 U.S.C. § 3553(a)(2).

**B. The MS-13 "Enterprise"**

Salvador and his codefendants' alleged ties to MS-13, which the government has made the centerpiece of this case as well as many other MS-13 cases it has prosecuted in this District, were tenuous at best. On this issue, what Salvador and the other defendants have written in their PSR objections bears repeating. MS-13 is a dangerous and vile entity, which in no way does this memorandum attempt to contradict. But the government has continually elevated MS-13 to almost mythical proportions by painting it as a distinct, highly organized, hierarchical "enterprise" with a discernable power structure and clearly defined objectives. This characterization of MS-13 as monolithic and all-powerful has been so pervasive it has found its way into the caselaw: some courts have repeated the government's descriptions almost verbatim. *See, e.g., United States v. Sandoval*, 6 F.4th 63, 73 (1st Cir. 2021) ("MS-13 is a transnational criminal organization based in El Salvador. In the United States, MS-13 is organized into small local groups called 'cliques.'").

The truth is that the government for its own purposes, breaths too much life into MS-13, as there is evidence the group is not nearly as well-organized as published articles and the caselaw itself suggests. There is no MS-13 CEO. There is no central office where cliques can make quarterly and annual reports. The government's assertion that "MS-13's core principles

and mission [are] to attack and murder suspected gang rivals and those suspected of cooperating with law enforcement" (PSR ¶ 41), is not a sustainable business model. Again, this is not to say the idea of MS-13 is not dangerous or that those committing crimes because of perceived loyalty to that idea do not deserve prosecution, but there is countervailing evidence that MS-13 is actually much more loosely organized with cells existing across Central America, the United States and Mexico.

This is important because to claim there is one all-powerful MS-13 calling the shots from El Salvador is to give credence to its charged status in this case as the "enterprise," a strategy which provides the government a great deal of cover in presenting its case. Had the government cited the Sykos Locos Salvatrucha as the enterprise, which the government has done in other street-gang RICO prosecutions, *see, e.g., United States v. Green, et. al*, Crim. No. 15 02-10301 (D. Mass. 2006); *United States v. Wurie, et. al.,* Crim. No. 15 03-10329 (D. Mass. 2006), the requirement to show a "pattern" of racketeering that also affected interstate commerce would have been arguably more burdensome. The case as indicted is essentially a murder prosecution involving one incident and one victim (and the indictment tellingly cites the Massachusetts General Law that was violated). Presenting "MS-13" as the enterprise, however, resolves that problem. As the indictment claims, it is an extremely large and ongoing organization which functions in more than one country and is involved in any number of federal crimes, including "narcotics trafficking, firearm possession, robbery," etc. *Id.*[2] Therefore, per the government, the

---

[2] Interestingly, the indictment does not even list Salvador or his codefendants as members of the Sykos Locos clique. They are, instead, charged as members of MS-13, and the name "Sykos Locos Salvatrucha" appears only once in the indictment (and in subsequent superseding indictments, as well as the superseding information filed against Salvador) in a list of "[s]ome of the cliques in Massachusetts…" *Id*. Count One, ¶ 3.

decision to kill Herson Rivas was not rooted in the Sykos Locos members' personal distrust or animosity toward him, it arose out of an actual connection to a tangible and nefarious organization.

In reality, the clique's status as an actual fully functioning and sanctioned MS-13 franchise remains shaky at best. The evidence shows that Salvador's group was mostly "doing their own thing" and did not care that much about appeasing anyone in El Salvador professing to speak for any organization. The group did not assess "dues" from its members and forward them to some central headquarters.[3] Neither did the coconspirators commit crimes in accord with some playbook or at the direction of an unknown and unspecified MS-13 "nabob."[4] Even the decision to kill Rivas, arguably the only significant thing the Sykos Locos clique perpetrated, was not "greenlighted" by anyone in El Salvador, and nowhere within the government's discovery is there evidence to the contrary. That unfortunate decision was entirely made and carried out by the group's members, and any rumors that MS-13 Central was going to retaliate because the killing had not been ordered or pre-approved by "leadership," something that has been presented as one the enterprise's rules, did not materialize into reality.

---

[3] This directly contradicts one of the government's assertions regarding how MS-13 cliques operate in service to one umbrella organization: "**All** of the cliques under the various MS-13 programs, including those in Massachusetts, most of which fall under the East Coast Program, **held meetings to collect dues** from individual MS-13 members. The dues from each clique were then generally provided to the program leader (e.g., the East Coast Program leader), who transferred the money, usually via wire transfer, to the incarcerated MS-13 leaders in El Salvador, known as 'La Ranfla.'" *United States v. Recines-Garcia*, Crim. No. 15-10338-FDS, Indictment, Count Two, ¶ 7 (emphasis added).

[4] Contrast this to *United States v. Leoner Aguirre*, 939 F.3d 310, 313 (1st Cir. 2019), in which there was actual evidence that an MS-13 clique "The Enfermos" operated in El Salvador and in Massachusetts, and dispatched the defendant to the United States to enlarge the clique, overseeing the activities of other clique members and participating in murders.

Like Boston Red Sox superfans, the Sykos Locos clique certainly had an all-encompassing "wannabee" attraction to MS-13 and emulated what they understood to be the stereotypical lifestyle, displaying common tattoos and indulging in an affinity for, *inter alia*, Chicago Bulls caps (presumably on the days they are allowed to wear red).[5] Salvador willingly took part in this cosplay, presenting himself as a bona fide member of MS-13 by his appearance and mannerisms, displaying the tattoos and posing for photographs acting out the "thug" lifestyle. But he did that to get along and be accepted by the others, a desire that motivated him to take part in all of the group's activities, including the Rivas murder (which he initially did not support, believing it to be unnecessary, but subsequently participated in willingly and voluntarily). The desire for acceptance is also what drove him to participate in the Ruano murder along with two other men associated with a different clique.[6]

---

[5] One example of how the government successfully leans on the MS-13 enterprise claim as a crutch occurred in *United States v. Sandoval*, et al, Crim. No. 15-10338-FDS (D. Mass. 2018). One of the defendants Erick Argueta Larios had his sentence greatly enhanced because a jailhouse informant testified at trial that Larios had confided to him, while the two were detained together, about plotting to kill the main confidential witness (whom the FBI had planted in the clique). There was no other evidence corroborating this claim, which actually would have been out-of-character for Larios, who had no history of violence. The sentencing court determined, however, that the claim was proven by a preponderance of the evidence because a law enforcement witness had testified at trial that one of the "core" – and generic – objectives of the MS-13 enterprise was to kill informants, as if that was unique to any other street gang.

[6] The PSR indicates the men were members of the "Huntington clique." (PSR ¶ 80). That the Ruano killing is charged in Salvador's superseding information as one of the "means and methods" of both the conspiracy and the enterprise is another testament to how naming MS-13 as the enterprise allows the government to add an incident completely unrelated to the actual conspiracy (as no other Syko Locos member was involved), but still present it as such.

### C. Salvador's History and Characteristics

Salvador was certainly not a leader of the clique, neither in a legal sense (for sentencing purposes) or in the literal sense. He was not even a "squad leader" or a squad leader's assistant. Salvador was and still is a follower. This is not to say he has not taken initiative and done things of his own accord. He took the initiative to leave his home country when he was 15, wanting to escape the violence that had become a prevalent element in his life both within his local community and his own home (where he suffered abuse from his own family members, as documented in the PSR at paragraphs 185, 186 and 196, and the report of Barbara Quinones, Ph.D., which has been previously provided). His strenuous journey from El Salvador to the U.S./Mexico border was accomplished mostly on his own. He had help at times, and not all of the travel was on foot. But he managed that feat at an age few others could match.

When he arrived in the United States, Salvador became instantly lost, an outcast in a strange country where he was ill-equipped to succeed. After reuniting with a mother he had not seen since he was two years old, Salvador struggled to acclimate to his new life in Sommerville, Massachusetts. Life there was faster paced, more hectic, and often more hostile and unfriendly than the one he left behind. More significantly, it was much more confusing to one with little education, a rudimentary understanding of English, and no speaking skills or abilities to express himself in writing. The Sommerville school system only exacerbated these cognitive disadvantages by placing him in a grade level far beyond his intellectual abilities, even after measuring those abilities through various academic tests in November 2015. Salvador's score on the Wechsler Individual Achievement Test, while no doubt disappointing, cannot be said to be surprising: His performance placed him in the third percentile, meaning 97 percent of children

11

his age scored higher. On the Wechsler Intelligence Scale for Children, he scored in the

Borderline Range for Verbal Comprehension, in the Very Low Range for Perceptual Reasoning,

Processing Speed, and for Working Memory. Based on this testing, Salvador was diagnosed with

Post Traumatic Stress Disorder.

Despite those assessments, Salvador was placed in school with others his general age and

physical size but who were eons ahead of him culturally and socially, particularly in the insular

society of native-born Somerville teenagers. Gifted with a threadbare existence, he soon learned

that in high school appearances are important, and being the possessor of an individual education

plan and no money was not a harbinger of social success and acceptance. Not innately lazy, he

sought work but quickly learned that a government-issued ID is required for all legitimate

employments (as are English-language skills). He was therefore reduced to seeking low-paying

"under the table" work, with long hours and poor conditions. Eventually, Salvador began

connecting with others who had very similar backgrounds; teens who had also emigrated to this

country from Central America, who spoke primarily Spanish, whose families had little to no

money, and who were struggling in school for many of the same reasons that inhibited

Salvador's progress at fitting into the social mainstream. As disaffected youths alienated from

the mainstream, Salvador and his new friends were either prime candidates for recruitment, or

had already been recruited, into the gang life. [7] And as Central American emigrees, they were

prime targets for membership in MS-13.

_____

[7] As a vulnerable outsider in need of friendship, guidance, protection, and acceptance, Salvador
was particularly susceptible to anyone who could provide those things and more. Rather than
becoming an enthusiastic participant in an international criminal cabal, Salvador instead became
a luckless follower in a dark and twisted version of "The Pied Piper of Hamlin," with the role of
the Piper falling to codefendant Erick Lopez Flores. Known as "Mayimbu" to the group and self-

Salvador soon fell into legal trouble, being stopped on two occasions carrying knives (PSR ¶¶ 179-180), which he believed he needed for his own protection. In November 2017, based upon an evaluation and report from Daniel A. Sanford, Psy.D. (previously provided to this Court), Salvador was found not competent to stand trial and unlikely to become competent in the foreseeable future by two judges of the Middlesex County Juvenile Court and a justice of Suffolk County Juvenile Court. *See* Middlesex Juvenile Docket 15DL1055CA and Suffolk Juvenile Docket 16DL0676CH.

### D.  Salvador Is Not Permanently Incorrigible

Life is the sentence the government will request, and that request will likely be accompanied with a characterization of Salvador as a vicious viper, dangerous and irredeemable, deserving of imprisonment where once the iron door is locked behind him the key can be discarded. In addition to emphasizing that under the Massachusetts statute M.G.L. c. 265 § 1, the murders were committed with "extreme atrocity and cruelty and unlawfully with malice aforethought," the government will also likely claim that Salvador is a perjurer, citing Salvador's assertion in immigration court in 2018 that he was not an MS-13 member, a claim that influenced the judge to adjust Salvador's immigration status and release him after several months in custody. The government will declare to this Court that Salvador cannot be believed or trusted

---

described as the "Second Word," Flores became the older role model and, by virtue of his access to money from an automobile accident settlement, allowing him to "pick up the check," along with his proclivity to introduce Salvador and the others to the female friends of his significant others, Flores always ensured himself a ready supply of younger admirers and wannabees. Unlike the fable, the followers here visited extreme violence on the luckless objects of the group's damnation (most significantly, Rivas), but just as in the fable they sealed their fate by following the Piper.

and that allowing him to ever leave prison, even as a senior who will have "aged out" of a tendency or propensity to commit crimes, will be unwarranted.[8]

However, Salvador is not irredeemable or permanently incorrigible. As this Court knows, "permanently incorrigible" is a term that sometimes arises in cases involving juveniles who face life sentences or the equivalent for serious crimes. Although determining that a juvenile defendant is permanently incorrigible is not a necessary finding before condemning that defendant to life in prison, *Jones v. Mississippi*, 141 S. Ct. 1307, 1310 (2021), a sentencing court must still consider "an offender's youth and attendant characteristics." *Id.* (quoting *Miller v. Alabama*, 567 U.S. 460, 483 (2012)). "Juveniles inherently lack maturity; they do not have a fully formed character and a fully developed sense of responsibility; and they are both more susceptible to external influences and less able to control their environment than are adults." *Malvo v. Mathena*, 893 F. 3d 265, 271 (4th Cir. 2018). Further, in consideration of these characteristics and the struggles of youth they represent, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

Salvador, of course, is no longer a juvenile. Although he was under 18 when he participated in the Ruano murder, and the legal discussion regarding juvenile culpability applies directly to that incident, he was 19 during the one month he was a member of the Sykos Locos

---

[8] Salvador has thoroughly addressed this claim in his objections to the PSR, explaining how the defective assistance he received from his immigration counsel led to a number of negative and avoidable consequences, as well as the fact that he was not a member of MS-13 at the time of the hearing and only became an MS-13 member (or more accurately, a Sykos Locos clique member) after disposition of the immigration case and his release from ICE custody.

clique and a participant in the charged RICO conspiracy, including the day of the Rivas killing. Despite Salvador not being within that protected class, the reasoning behind the justice system treating juveniles differently is still applicable to him. Certainly, his crimes "reflect[s] the transient immaturity of youth." *Montgomery v. Louisiana,* 136 S.Ct. 718, 734 (2016).

While age 18 is designated as the legal end of juvenile status, the person is still a "teenager," and realistically it is not a magical turning point: There is no sudden metamorphosis that occurs at midnight of an eighteenth birthday turning an immature, irresponsible child into a mature, well-reasoned adult. In fact, the scientific research shows that cerebral development in areas which control and affect behavior continues into a person's early twenties. Maturity, then, is a relative consideration, one that will vary with a variety of factors.

In Salvador's case there is ample documentation to show that his adolescent brain development was stunted and had fallen well behind others of the same age, a possible result of childhood trauma from exposure to violence, along with a continuing absence of positive social factors. *See, e.g.* Report of Gary Slutkin, M.D., December 21, 2021, attached herein as **Exhibit A** (examining how Salvador and his codefendants' exposure to violence at a young age created psychological trauma which was left untreated and may have been a significant causal factor in their subsequent violent behavior). Salvador's low ranking on the Wechsler Intelligence Scale and the finding he was incompetent to stand trial in juvenile court are not relics of ancient history. In fact, they were relatively fresh assessments when he engaged in the conduct at issue in this case.

The juvenile characteristics cited by the *Malvo* court arguably all apply to Salvador through the pendency of this prosecution: He did lack maturity, he did not display a fully

developed character or sense of responsibility, and his eagerness to follow Flores and his Sykos Locos peers showed how susceptible he was to their influence and how little control he exerted over his environment. *See Malvo*, 893 F. 3d at 271. "[A]s scientific and sociological studies have confirmed, juveniles are less mature and responsible than adults, which often result[s] in impetuous and ill-considered actions and decisions." *Jones,* 141 S. Ct. at 1329 (internal citations and quotation marks omitted). Again, individuals mature at different rates, and even a mature person having reached the age of 18 does not automatically shed the high potential for making "impetuous and ill-considered actions and decisions." *Id.*

However, just as with juveniles, Salvador's mind is still malleable, it is still forming, and he is therefore "more capable of change" and "more capable of being reformed." *Malvo*, 893 F. 3d at 271. The transitory character of a young person, particularly a teenager, changes with age, and "as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Jones, supra*, at 1329 (quoting *Roper*, 543 U.S. at 570). "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper*, *supra*, at 570. Salvador's adolescent development has been tragically behind the norm but it does continue, and there is no reason to believe Salvador "forever will be a danger to society." *Jones, supra*, at 1329 (quoting *Graham v. Florida*, 560 U.S. 48, 72 (2010)).

As Salvador pointed out in his PSR objections, only three defendants among the 65 inaccurately tagged as "Related Defendants" (PSR ¶¶ 9-10, 12-13),[9] have to date been sentenced

---

[9] Those defendants from different MS-13 cases are not "related" to the defendants in Salvador's case. The lone exception is Romero, who was indicted separately for violating the RICO statute but was an active member of the Sykos Locos. (PSR ¶ 11).

to life in prison. They are: Noe Salvador Perez Vasquez; Hector Enamorado, and; Edwin Gonzalez. All three were convicted by juries at trial, as opposed to Salvador, who admitted guilt and accepted responsibility for his participation in two murders. Vasquez was a career criminal and one of the leaders of the large and violent Everett Loco Salvatrucha clique. Much like Leoner Aguirre, Vasquez was an MS-13 cheerleader who actively worked to grow the size of the gang in Massachusetts. He also engaged in substantial trafficking of cocaine and marijuana, to provide financing for his clique. In December 2014, Vasquez conspired with Enamerado (from the Chelsea Locos Salvatrucha clique) to murder a supposed rival from the 18th Street Gang. The day after that man beat up Enamerado in a fight, Enamerado shot him to death using a firearm Vasquez provided. Aside from getting personal vengeance against an 18th Street Gang rival, Enamerado also shot an innocent bystander in the chest during the same incident. Fortunately, the man survived. Seven months later, Vasequez ordered the murder of a teenager wrongly suspected of being a police informant.

Gonzalez was a member of the morbidly violent Molinos Locos Salvatrucho clique, which once had its own promotional YouTube video featuring members proudly singing a song about how they would hideously murder and mutilate any of their perceived enemies. Presumably, YouTube removed the video from its service when someone at the company finally got around to watching it. Gonzalez lived out the video's reprehensible fantasy by actively stabbing and mutilating two teenagers to death, in September 2015 and January 2016. While Salvador's crimes may appear similar at first blush, Gonzalez took a leadership role in his murders. He set the victims up, posing as a teenage girl on Facebook who contacted them and asked them if they wanted to meet up for a "date." Gonzalez then directly lured each victim to an

17

isolated rendezvous point at a designated time. When the boys arrived, Gonzalez and other clique members jumped out from their hiding spots holding knives and other weapons which they then used to hack and bludgeon the unfortunate teens to death.

Salvador also participated in two murders, but he did not order the killings (like Vasquez), nor did he initiate or plan them (like Enamerado and Gonzalez). He participated, willingly, but he went along with the killings to either impress the young men he was with or gain their acceptance. As noted above, these were young men with whom he shared a number of traits including an impoverished upbringing, abuse by relatives or family acquaintances, and a frequent exposure to violence. When he could not fully and emotionally connect with his own family members in Sommerville, especially after he was released from immigration custody, the members of the Sykos Locos became his family.

This memorandum is not an attempt to discount the seriousness of Salvador's crimes or portray them in an insignificant light. And it certainly is not an attempt to justify them. The murders cannot and should not be overlooked. Salvador knows he faces decades in prison, and he is prepared to serve that time. With that realization in mind, Salvador respectfully asks this Court to recognize that he committed these offenses at a time when his mental abilities were measurably underdeveloped and his impulse control was at its weakest. Those days are gone, as is his desire to continue living the MS-13 gang life. He cannot take back the past or undue the great and permanent harm he has caused to Ruano and Rivas, as well as to their families and friends. He deeply regrets his involvement in their deaths, and for that reason he assures the Court that he can be rehabilitated and he can eventually age out of a continued criminal life.

**E. Other Factors.**

    1.  Deportation

It is a foregone conclusion that if Salvador is sentenced to a term less than life in prison, and then lives long enough to see his release date (a date that will likely be long after the undersigned counsel has moved on to his Eternal Reward), Salvador will be immediately turned over for deportation proceedings. Before being sent back to El Salvador, a country that will probably seem as foreign to him then as the United States did upon his arrival as a 15-year-old, Salvador will likely spend a significant time in ICE custody. This Court can consider the effects of his alien status as part of his personal history and characteristics. *See United States v. Hercules*, 947 F. 3d 3, 9 (1st Cir. 2020) (holding "that a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors in an effort to fashion a condign sentence."); *United States v. Bakeas*, 987 F. Supp. 44, 46 (D. Mass. 1997) (departing in light of how the defendant's alienage would affect his potential sentence length).

    2. Cost of Incarceration

By statute, the Court is directed to consider the cost of incarceration in regard to determining any fine the Court may choose to levy. Suffice to say that Salvador will be unable to satisfy such a fee, even one of minimal value. The incarceration cost, however, could also be looked at as one of the many factors this Court considers in fashioning an appropriate sentence. As noted in the PSR, the most recent estimated cost for housing an inmate for one year in a federal prison facility is $44,258.00. (PSR ¶ 227). That number, of course, is in present U.S. dollars. Assuming no inflation, a 360-month term, the low-end of Salvador's appropriate GSR,

19

would result in a bill in excess of $15.9 million. A 420-month sentence would cost over $18.5 million, and 480 months in prison would be over $21.2 million.

### F. Recommendation

Salvador is more than the worst thing he has done. Life in prison is a sentence that should be reserved for the worst of the worst, and Salvador is not that. Salvador respectfully asks that this Court:

a) Disregard the PSR's proposed two-level enhancement to Salvador's Guidelines calculation (for use of a minor in the commission of the offense), and determine that his true total offense level is 42, resulting in a GSR of 360 months to life, and;

b) After considering the factors this memorandum has presented, including Salvador's history and characteristics, as well as the nature and circumstances of the offense, sentence Salvador to a prison term of 400 months.

### CONCLUSION

For the reasons stated above, the defendant Salvador requests that this Court impose a sentence of 400 months. Such a sentence would punish him adequately, but not longer than necessary to achieve the goals of sentencing articulated at 18 U.S.C. § 3553(a)(2).

Respectfully submitted,
HENRI SALVADOR GUTIERREZ

By his attorney,
/s/    *George F. Gormley*
George F. Gormley
BBO# 204140 / App. No. 11595
*George F. Gormley, P.C.*
160 Old Derby Street
Suite 456
Hingham, MA 02043
(617) 268-2999

Date: December 22, 2021

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>/s/  *George F. Gormley*</u>
George F. Gormley