## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

HENRY SALVADOR GUTIERREZ,
a/k/a PERVERSO,
                    Defendant.

Case No. 18-cr-10450-MLW-2

### SENTENCING MEMORANDUM OF THE UNITED STATES

Henri Salvador Gutierrez, known by his gang name of "Perverso," is a homeboy and established member of the MS-13 gang with a penchant for extreme violence. In addition to participating in the charged racketeering conspiracy, Salvador participated in two separate horrific murders—one in East Boston in 2016 and the other in Lynn in 2018—in each instance playing a critical role in repeatedly stabbing a teenager to death. Each of Salvador's cold-hearted murders furthered the core operating principles of MS-13—his first murder involved the killing of a victim whom Salvador and other MS-13 members suspected of being a gang rival, and his second murder involved the killing of a victim whom Salvador and others suspected of being a cooperating witness.

Salvador would likely not have been in a position to commit the murders if he was not also making a mockery of America's immigration laws at the same time. Salvador came to the United States unlawfully and brought the gang's violence to our community. He was arrested multiple times for carrying knives/machetes. He then went on to commit the horrific 2016 murder of a teenage victim at a public stadium in East Boston. After getting away with that murder, he was again arrested by immigration authorities. Despite the efforts of the Department of Homeland Security to detain and deport him based on his gang involvement, Salvador convinced an immigration judge that he was not in a gang

and would not join a gang, that he had not harmed and would not harm anyone, and that he should be released from immigration custody and given lawful permanent residence status. Barely a month after being released from immigration custody in 2018, he went on to savagely murder another teenage victim, this time in a public park in Lynn.

Salvador's guideline sentencing range for his role in the MS-13 racketeering conspiracy is life in prison. State law calls for Salvador to receive a sentence of life in prison for his multiple murders. Federal law calls for Salvador to receive a sentence of life in prison for his multiple murders. Justice for the victims calls for a sentence of life in prison for Salvador. The 18 U.S.C. § 3553(a) sentencing factors support a sentence of life in prison for Salvador. Similarly situated defendants who have committed multiple murders have been sentenced of life in prison.

The government respectfully asks the Court to impose a sentence of ***life in prison***. This is an unusual recommendation on a guilty plea. It is not, however, an unfair or unduly harsh recommendation. To the contrary, each of Salvador's murders would have independently led to a guideline sentence of life in prison and the facts would have justified that sentence. Certainly, when the two murders are viewed in combination, anything less than a guideline sentence—especially given the aggravating factors present in this case—would be insufficient to further the goals of sentencing. Salvador brutally killed two teenagers. He bragged about it on tape in a way that showed little remorse for his crimes. Far from it, the recording showed that the murders were actually a source of pride (and amusement). His deplorable conduct while in pretrial custody only further confirms the fact that he is unable to live within the bounds of the law. Through his actions, which include the taking of two innocent lives, Salvador has earned a sentence of life in prison, which is the sentence the Court should impose.

**A.    The Nature and Circumstances of the Offense and the Multiple Murders Committed by Salvador Call for a Sentence of Life in Prison.**

Each of the sentencing factors outlined in 18 U.S.C. § 3553(a), individually and especially in combination, support the government's recommended sentence.  Before turning to the murders committed by Salvador, the government comments briefly on Salvador's participation in the MS-13 gang.

La Mara Salvatrucha or MS-13 is one of the most violent gangs operating in the United States.

> MS-13 has gained notoriety for the brutality of its crimes and the relative youth of both its members and its victims. The gang's reach spans the Western Hemisphere: although its leadership remains in El Salvador, many of its regional and local branches, known respectively as "programs" and "cliques," are located throughout the United States. The web woven by MS-13 is so pervasive that the federal government often refers to the gang as a transnational criminal organization.
>
> Of particular pertinence here, MS-13 is quite active in the Boston area. Prominent MS-13 cliques exist in East Boston, Chelsea, Everett, Lynn, and Revere.

*United States v. Gonzalez*, 981 F.3d 11, 14 (1st Cir. 2020) (affirming life in prison sentence for an MS-13 member who, like Salvador, committed two murders in furtherance of the MS-13 enterprise).

> MS-13 has defined its primary mission as killing rivals, especially members of the 18th Street gang. If possible, a homeboy is supposed to kill a rival gang member, known as a "chavala," on sight. MS-13 members are also required to help out fellow gang members whenever they are asked.
>
> MS-13 members are forbidden from cooperating with law enforcement. A member who cooperates with law enforcement will have a "green light" put on him, which means he will be killed by other MS-13 members.

*United States v. Perez-Vasquez*, 6 F.4th 180, 187 (1st Cir. 2021) (affirming life in prison sentence for another MS-13 member who, like Salvador, was convicted of RICO conspiracy and held responsible for his involvement in two murders).

Given the senselessness and brutality of its crimes, MS-13 has been deemed to be such a threat that combating MS-13 violence has been a law enforcement priority across political administrations.  In 2012, MS-13 became the first street gang to be designated by the United States as a "transnational criminal organization" or TCO.  In 2017, the President of the United States directed a whole-of-government approach to dismantle MS-13 and certain other high-priority TCOs.  *See U.S. Department of Justice*, "Full Scale Response: A Report on the Department of Justice's Efforts to Combat MS-13 from 2016-2020," available online at *https://www.justice.gov/archives/ag/page/file/1329776/download*.  And in 2018, the Attorney General of the United States created the Transnational Organized Crime Task Force, specifically targeting five of the highest-priority TCOs in the world:  MS-13; Lebanese Hezbollah; Sinaloa Cartel; Clan del Golfo; and Cartel de Jalisco Nueva Genaracion.  *Id.*[1]

Salvador's membership in MS-13 is not in question.  Among other evidence, Salvador self-identified as an MS-13 member in the 2018 recording, there are countless pictures of him associating with MS-13 members, there are numerous phone calls between him and other MS-13 members, and multiple MS-13 members have identified Salvador as an MS-13 homeboy.  Moreover, he literally has MS and the gang's deviled-horns logo tattooed on his body:

---

[1]     The U.S. Attorney's Office in the District of Massachusetts has similarly prioritized this gang across administrations.  The investigations leading to the *Recinos Garcia* case took place in 2014-2016, resulting in what was at the time believed to have been the largest single federal takedown of the gang in U.S. history. *See, e.g.*, *United States v. Lopez*, 957 F.3d 302 (1st Cir. 2020) ("The backdrop of this sentencing appeal is the government's relentless pursuit of a notorious criminal gang, famously known as MS-13.").  The investigations into MS-13 continued in 2017-2018 after the change in administration, work that led to the indictment in this case in November 2018 as well as other indictments of MS-13 members in this District.

 

## 1. __The December 2016 Murder of Luis Ruano.__

On Saturday, December 24, 2016, at about 11 p.m., the Boston Police Department reported to Memorial Stadium in East Boston after receiving a report of a body lying at the bottom of stadium stairs.  The stadium, near Logan Airport, has a large field and a running track that is open to the public.  The body was found at the bottom of some stairs leading down from the bleachers.



Out of respect for the victim and given the graphic nature of the crime scene, a sampling of additional crime scene photographs is being submitted under seal as Ex. 7.

The victim was identified as Luis Fernando Orellana Ruano, an 18-year-old Guatemalan national.  An autopsy by the Medical Examiner concluded that the manner of death was homicide, and the cause of death was multiple sharp force injuries.  The victim had at least a dozen sharp force wounds consistent with a stabbing, with significant injuries to the neck, chest, and back.  His throat appeared to have been slashed, and he had multiple incised wounds to the neck and multiple stab wounds to the chest.

The Boston Police Department Homicide Unit and the Suffolk County District Attorney's Office investigated this murder.  Based on the manner and means of death—which was consistent with MS-13's trademark of killing people by repeatedly stabbing them to death—and based on rumors relayed to law enforcement from informants, there was almost immediate suspicion that this murder was committed by MS-13 gang members.  While no consistent story emerged from the initial investigation, suspected MS-13 gang member Henri Salvador Gutierrez a/k/a Perverso became a prime suspect in the case.  State authorities interviewed Salvador as part of their investigation, but Salvador denied any involvement in the murder.  Ultimately, law enforcement was unable to develop sufficient evidence to charge anyone with this murder.  The murder of Ruano remained unsolved/uncharged for a number of years.

Fast forward to 2018: federal law enforcement investigated MS-13 members in connection with the 2018 murder of Herson Rivas in Lynn (discussed further below).  Law enforcement not only suspected Salvador of committing the 2018 murder in Lynn, but also of committing the 2016 murder in East Boston.  Federal authorities wired up a cooperating MS-13 member (codenamed CW-13) to whom Salvador (then in state custody

on a firearm possession charge) detailed various of his MS-13 exploits.  On the October 24, 2018 recording, Salvador admitted (and bragged about) his participation in the 2016 murder, also providing significant details about the murder.  A transcript of the October 2018 recording is submitted under seal as Ex. 1.

On the recording, Salvador confirmed the identity of the victim he killed at the Memorial Stadium near the East Boston Airport, referring to the victim by his nickname of "Ardilla," which is Spanish for squirrel.  [The investigation revealed that at some point, Ruano had a long ponytail down his back with a blond highlight, which apparently made gang members think he looked like a squirrel.]

| CW-13: | What was that boy's name? |
| PERVERSO: | The truth is that I don't know what his name was, dog, but he was called ARDILLA. |
| CW-13: | The one you killed? |
| PERVERSO: | Uh-huh. |

Ex. 1 at p. 11.  Even this minor exchange shows the deeply troubling and senseless nature of the violence perpetrated by Salvador and his fellow MS-13 gang members.  Salvador did not even know the victim's name, yet Salvador's thirst for violence and commitment to the ideals of MS-13 compelled Salvador to lure this victim on Christmas Eve and butcher him to death at a public stadium.

On the recording, Salvador claimed that the victim had been deemed disloyal because he was associating with the rival 18th Street gang.  Salvador stated that multiple MS-13 members/cliques had targeted the victim for death, and Salvador suggested that he might get in trouble for this murder since members of MS-13's Everett clique wanted to murder this person themselves, but Salvador beat them to the task.  Salvador also admitted to helping lure the victim to the stadium near Logan Airport:

| | |
|---|---|
| CW-13: | So, the boy at the airport, with what bullshit did you guys lure him out? |
| PERVERSO: | No, that guy, basically, was supposedly for the Everetts, dude. The Everetts were bullshitting him, because the Everett's wanted to kill him, dude, and all the Everetts were furious with me. Because the Everetts had already reported that murder down below, that they were going to kill him on a certain date, dog. |
| CW-13: | The boy at the airport? |
| PERVERSO: | The boy at the airport. But I didn't know anything about that. that the dudes were going to kill him. I lured him out first, dude. I set up another boy to lure him out, and he fell for it and I killed him and the Everetts said to me, "Big problem, dude." Had it been down below, dude, they would have even killed me, dog, they said to me. "Fuck you, son of a bitch," I told them! |

*Id*. at p. 10.

Salvador then appeared to implicate "Duende," a member of the Huntington clique of MS-13, in the murder.  Salvador seemed incensed that Duende tried to claim credit for this murder, suggesting that Duende only stabbed the victim once or so, while Salvador had been the main attacker who actually killed the victim.   Salvador stated that Duende had been promoted for his role in the murder by the Huntington clique, although Salvador appeared upset that Duende overstated his relative role in the murder:

| | |
|---|---|
| CW-13: | Who lured him [the victim] out? |
| PERVERSO: | A guy from the Huntingtons. A boy from the Huntingtons. |
| ... | |
| CW-13: | But he's [the Huntington member] already been jumped-in [promoted and made a full member of MS-13]? |
| PERVERSO: | No, dog. The thing is that here there isn't a single dude from the Huntingtons, dog. He was a chequeo before, because he came here from New York. I met him here, |

8

|  |  |
|---|---|
|  | dude, and it was for that thing that the Huntingtons gave him the pass to get jumped-in. |
| CW-13: | For the thing at the airport? |
| PERVERSO: | Uh-huh, but the Huntingtons, dude, he had told the Huntington's that he alone was the one that had killed him. So, I was with some dudes from the Huntingtons and they asked me where I was from, and I said I was from Boston. |
|  | Then the dude asked me if I knew someone called Duende. I said yes. So he tells me, "Isn't it true that dude killed a chavala, there, all by himself?" I said, "Bullshit, son of a bitch. I took him [victim], but he [Duende] was there watching; yes, the son of a bitch [Duende] stabbed him with the knife, like this, but I was the one that took [killed] him [the victim]." "So how come the dude [Duende] said he was alone there?" the guy said to me. They were going to jump him in, dog, and give him another 13 [second beating] for bullshitting them. Because he [Duende] told them that he had done it [the murder] alone. |

*Id*. at pp. 11-12.

Later, Salvador described how he had left the victim with his pants down. Salvador claimed that he was trying to lower the victim's pants and lift his shirt to see if the victim had any 8s or other tattoos or markings confirming membership in the rival 18th Street gang. Salvador also stated that he had previously seen a picture of the victim flashing a rival gang sign:

|  |  |
|---|---|
| PERVERSO: | He was left with his pants down, doggie. I wanted to steal his shoes, dude. But they were already stained, brand new shoes, the son of a bitch. |
| CW-13: | But why did you undress him? That's what I don't understand. |
| PERVERSO: | To see if he had eights. |
| CW-13: | Supposedly you took off his shirt also? |

| PERVERSO: | The shirt didn't have anything, dog. He had, on his chest, UI. |
|---|---|
| CW-13: | But you undressed him to see if he was stained? |
| PERVERSO: | Uh-huh. Because I had never found a photo of him flashing the chavala sign, but people, yes. A homie female UI a chavala. I read a son of a bitch message. UI, dog. He was in a picture with a girl, flashing the chavalas. So I thought, this son of a bitch must be tattooed so I'm going to take off his pants. He had the "8", and in the middle of the 8 it had UI. |

*Id.* at 30.  [The autopsy pictures do not appear to show any "8" tattoo symbolizing the victim's membership in the 18th Street gang.  It is unclear if Salvador stated the possible tattoo connection as part of a ploy to claim credit for killing a gang rival instead of having to admit that he may have killed an innocent teenager.]

Further confirming that this 2016 murder was part of the gang's pattern of racketeering activity, Salvador stated that he had shared information about this murder with other members of the Sykos clique, and that co-defendant Erick Lopez confirmed Salvador's story by searching for information about the murder on the internet.

| CW-13: | But, did the dudes know about the murder [ ]? |
|---|---|
| ... | |
| PERVERSO: | At the airport? |
| CW-13: | Uh-huh. |
| PERVERSO: | The dudes had already checked. |
| CW-13: | Because when you have killed, and they find out, the other dudes also want to kill. |
| PERVERSO: | Yes. Dude, when I was out before, in 2017, before, before I did that murder, they didn't know me.  It hasn't even been two years, about two years.   Mayimbu [Lopez] told them that I had been jumped for a murder I had committed by the airport. The dudes looked up that thing, from December 24. |

CW-13:    On the internet?

PERVERSO:   Uh-huh, from 2016. Then Mayimbu [Lopez] told them that Mayimbu [Lopez] had looked it up like that, to look up murders in Boston, 2016, December 24th …. and the culero boy comes up in photos, his face.

*Id*. at 29-30.

In a separate part of the conversation, Salvador recounted his history with MS-13 and stated that he had been associated with the Trece Locos Salvatrucha or TLS clique of MS-13 at the time of the 2016 murder, before he switched to the Sykos clique. Salvador then again admitted to his participation in the 2016 murder while recounting a conversation he had with "Haze" [co-defendant Djavier Duggins, the leader of the Sykos clique]. Haze and other Sykos members had apparently been recruiting Salvador into their clique and had offered to admit Salvador into their clique at a higher rank based on his prior violence. Salvador, however, told them that in his mind, the prior murder should not count for full credit because Salvador was with another MS-13 clique at the time. Salvador apparently wanted to gain homeboy status in the Sykos clique based on even more murder and mayhem:

PERVERSO:   … Haze was getting out right about that time, dude, and Vago and Shadow. I met them and they asked me, what's up, what did I think [about joining the Sykos clique], dude? I told them I would think about it, and a few days later, dude, Haze [Duggins] called me. "What's going on? What did you decide?" "Yes, dude."

        So I was with them a good while ago. Afterwards, I beat up a son of a bitch over by Pollo Campero, and I stabbed him two times, dog, and he said to me, "Dude, we're making you Chequeo. I've also heard some things about you," he said to me. "No," I said to him, "for me, those things don't count. That was with another clique." I told him like that. "Dog, over at the park at the airport, I killed that son of a bitch." And he tells me, "That was it, dog."

*Id*. at 8.

Notably, at no point in Salvador's discussion about the 2016 murder—even two years after its occurrence—did Salvador show any remorse.  To the contrary, during the entirety of this conversation, Salvador appeared to be proudly boasting about his undertakings on behalf of the MS-13 gang.

The 2016 murder committed by Salvador (with the assistance of one or more other MS-13 members) was a first-degree murder under Massachusetts law, not only because it was committed with "premeditated malice aforethought," but also because it was committed with "extreme atrocity and cruelty."  M.G.L. ch. 265, § 1.[2]

The Massachusetts Model Jury Instructions on Homicide define "extreme atrocity and cruelty" as follows:

> Extreme atrocity means an act that is extremely wicked or brutal, appalling, horrifying, or utterly revolting.  Extreme cruelty means that the defendant caused the person's death by a method that surpassed the cruelty inherent in any taking of a human life.  You must determine whether the method or mode of a killing is so shocking as to amount to murder with extreme atrocity or cruelty.  The inquiry focuses on the defendant's action in terms of the manner and means of inflicting death, and on the resulting effect on the victim.

*See* Model Instructions, Murder in the First Degree, available at https://www.mass.gov/info-details/model-jury-instructions-on-homicide-iv-murder-in-the-first-degree.

---

[2]    Under Massachusetts law, first-degree murder is punishable by a mandatory sentence of life in prison if the crime is committed by an adult.  Salvador was under 18 years old at the time of this 2016 murder and over 18 years old at the time of the 2018 murder discussed below.  Under existing state law, he would have received a sentence of mandatory life in prison for the 2018 murder.  *See* M.G.L. ch. 265, § 2 ("any person who is found guilty of murder in the first degree *shall be punished* by imprisonment in the state prison *for life and shall not be eligible for parole…*") (emphasis added).  He would have received a sentence of up to life in prison and no less than 30 years for the 2016 murder, even though he was a juvenile at that time.  *See* M.G.L. ch. 279, § 24 ("…in the case of a sentence of life imprisonment for murder in the first degree with extreme atrocity or cruelty committed by a person on or after the person's fourteenth birthday and before the person's eighteenth birthday, the court shall fix a minimum term of 30 years…").

The words in the Massachusetts jury instructions—wicked, brutal, appalling, horrifying, revolting—apply with force to the 2016 murder perpetrated by Salvador and his fellow MS-13 gang members (as well as the 2018 murder perpetrated by Salvador and his fellow MS-13 gang member). Attached under seal to provide further context about the nature of the crime are certain crime scene photographs (Exhibit 7), certain autopsy photographs (Exhibit 8), and the autopsy report of Ruano (Exhibit 9).

The autopsy revealed that the victim had at least 11 significant sharp force trauma wounds. A number of the wounds were deep stab wounds to the chest and the back, demonstrating that the victim had been repeatedly stabbed with force. In addition to the stab wounds to the chest and back, the victim had multiple incised wounds to the neck, suggesting that Salvador had slit the victim's neck and throat. For example:

"Incised wound A of the anterior neck" is described in the autopsy as a "13.0 x 5.3 centimeter gaping incised wound that is oriented from 1 o'clock to 8 o'clock and is 13.3 centimeters in length with the skin edges opposed. ... The wound probes 3.7 centimeters from front to back. The wound extends through the skin and subcutaneous tissues of the anterior neck and transects the right and left omohyoid muscles, right and left sternothyroid muscles, right and left sternohyoid muscles, and the left thyroid cartilate, larynx." Autopsy at p. 4.

"Incised wound J of the posterior neck" is described as "13.2 x 1.3 centimeter gaping incised wound that is oriented from 9 o'clock to 3 o'clock and is 13.4 centimeters in length with the skin edges opposed. ... The wound probes 4.6 centimeters back to front. The wound extends through the skin and subcutaneous tissues of the posterior neck to the level between the occiput and the first cervical vertebra." Autopsy at pp. 6-7.

Given the width of the human neck, incised wounds over 13 centimeters long across both the posterior and anterior neck (in addition to multiple stab wounds to the chest and back) leave little doubt that Salvador was not just trying to kill the victim, but he also wanted to do so with extreme atrocity and cruelty, such as by slashing the victim's throat.  The fact that Salvador committed this brutal, appalling murder to further the objectives of a violent gang like MS-13—and that he did so in a public soccer stadium in Boston on Christmas Eve—only confirms the horrific nature of this crime.

### 2.  <u>The July 2018 Murder of Herson Rivas.</u>

As the appalling facts show, Salvador was not done with his murderous ways in 2016.  Despite the Department of Homeland Security arresting Salvador in 2017 on immigration charges and viewing him as a gang member and safety threat (all of which is discussed further below), Salvador managed to secure his release from immigration custody on June 25, 2018.  Barely a month later, and after having testified to an immigration judge that he was not in a gang and had no interest in violence, Salvador participated in the horrific murder of Herson Rivas in Lynn.

Like the 2016 murder in East Boston, the 2018 murder in Lynn also took place in a public park or recreation area.  On August 2, 2018, law enforcement officers responded to Henry Avenue Playground in Lynn, where a civilian witness had come upon the dead body of a young boy lying in a wooded area.  Out of respect for the victim and his family, and given the graphic nature of the evidence, certain images of the crime scene are being submitted under seal as Exhibit 4, but a zoomed-out version is included here:



Like the scene at the first murder committed by Salvador, this scene was gruesome, especially because the investigation revealed that Salvador and his co-defendants had committed the murder on July 30, 2018, three days prior, and had callously left the body to rot in the wooded area of the park.

The words in the Massachusetts jury instructions—wicked, brutal, appalling, horrifying, utterly revolting—again come to mind.  The luring of Rivas was wicked and cruel.  The attack on Rivas was brutal.  The condition in which his body was left was appalling.  The injuries suffered by Rivas were horrifying and unspeakable.  The injuries to Rivas were so numerous and extensive that the Medical Examiner could not even chart them all on one page.  *See* Ex. 6 at pp 31-32.



The body of Rivas had dozens of sharp force trauma wounds where he had been stabbed and hacked. Like the victim in Salvador's 2016 murder, some of the sharp force wounds to Rivas also appeared to be clear attempts to slash his throat/neck. For example, the autopsy report describes a "21 centimeter incised wound on the anterior neck" with "wound path directed from front to back" that not only perforated the skin but also "penetrated the anterior aspects of the second to fourth vertebrae." Some of the sharp force wounds to his chest cut right through his ribs. For example, left rib #4 was "sheared in two" "consistent with sharp force (stabbing)." Some of the sharp force wounds to his head included small pieces of metal embedded in his skull (which appear consistent with a knife or machete slicing through his skull).

Without repeating information that has already been placed before the Court, the government simply notes that Salvador's description of this murder is chilling. Salvador described with glee how he and the other gang members surrounded the helpless victim

and stabbed and hacked him to death while the victim appeared to be pleading for his life.

> PERVERSO: *And that boy, dude, looked at PELIGROSO, because PELIGROSO was the one that had lured the boy out, and he was saying, "PELI, PELI, PELI, PELI, help me, PELI, PELI!" he cried out like that.* And the son of a bitch was going to run from us. "Bullshit, son of a bitch," he [Lopez] said, and he kicked him immediately and smacked him once in the ass, boom! He was down, dude!
>
> CW: *MAYIMBU [Lopez] smacked him?*
>
> PERVERSO: *Uh-huh, and the son of a bitch fell.* He sat down, like this. I had the knife in my hand, but the dude only had that one stab wound that the dude had stabbed him, dude. So I grabbed a stick and I knock him down.

Ex. 1, Oct. 24, 2018 Salvador Recording Tr., at pp. 21-22 (emphasis added).

Salvador's descriptions of how the victim was stabbed to death with large knives or machetes display a callous disregard for the sanctity of human life. Salvador seemingly took pleasure in describing the teenage boy being struck, stabbed, and hacked, comparing the blows to the victim's skull by one of the murderers like "chopping wood" and comparing the cuts to the victim's body like "dicing" a cow:

> PERVERSO: Oh, dude, *so when I was about to go like this, dude, I see the dude, PELIGROSO, was already there, like he was chopping wood, the fucking dude, Bang! Bang! Bang! Bang! Bang! Bang! like that.* It was the knife he had, one of those son of a bitch knives. It was like this big, doggie. *It was about this big, and the fucking tip was like this, turned up, like this. Like the tip of a 'Tunca' [small machete in El Salvador] turned up.* The knife was like this big, like this big knife, like this, dude, in his big arms, the son of a bitch, UI. *And I, dog, I go and strike him in the ribs, dude! Bam!*
>
> ...
>
> CW: You stabbed him hard?
>
> PERVERSO: Yes. *Straight into his ribs, dude. And when I pulled out the knife, it was warped. The son of a bitch was warped.* Not just on the tip, but it came out kind of twisted. It warped, the son of a bitch.

> CW:        So, it warped when you UI.
>
> PERVERSO:   When I stabbed him, it came out. *And PELIGROSO, dude, he was dicing him as if he were a cow, that fucker!  The knife PELIGROSO had, dude, looked like a saw now, dude.  It broke, the son of a bitch, on the cutting edge.  It was warped. Because he was hitting him right on the skull, Clang! Clang! Clang! Clang!* and he only had one knife cut here, and he had already stabbed him, and this dude, from the other side, had stabbed him like this.  *And PELIGROSO hitting him on the head, and the boy, the son of a bitch, was like "PELI, PELI, PELI, PELI, PELI, PELI!"*

*Id.* at pp. 23-24 (emphasis added).

Salvador also described how the victim tried to get up, but the murderers had him surrounded, detailing how he [Perverso], Vaquerano [Peligroso], Tercero [Desalmado], and Reyes [Silencio] took turns stabbing the victim to death.   At one point, Salvador even bursts out laughing as he described the gang members taking turns on the victim as he was covered in blood and dying helplessly:

> CW:        And didn't the son of a bitch try to get up?
>
> PERVERSO:   No, dude, how could he get up? *We had the son of a bitch surrounded. And he thought that PELI would UI, but he was the one that stabbed him the most times!*
>
> ...
>
> PERVERSO:   *"PELI, PELI, PELI, PELI!," while the dude was laughing his head off, dude.  Because PELIGROSO was killing him.  And I was stabbing him with the knife, dog.  There where I was stabbing him, dude UI.  DESALMADO and SILENCIO were stabbing the knife right through him, bringing it down like this, dude. Bang, bang, bang, bang!*
>
> ...
>
> PERVERSO:   He had that and was stabbing him here, but *the boy was covered in blood, and they stabbed him! [Bursts out laughing.]*

> *... So the ones that stabbed him were me, PELIGROSO, DESALMADO, and SILENCIO, dude.* We were the ones that stabbed him, dude.

*Id.* at 24 (emphasis added).

Even if viewed in isolation, this type of "brutal, appalling, horrifying, or utterly revolting" crime would be deserving of life in prison under Massachusetts law. Here, of course, the murder contains numerous aggravating factors in addition to the inherent cruelty of the crime. As this prosecution has shown, this murder was part of an effort to further the mission of one of the most violent gangs in the country—a gang that federal law enforcement is working hard to combat, and a gang whose senseless violence merits the strongest response from federal courts. The fact that Salvador and others committed this murder on behalf of a gang like MS-13, and notably, that Salvador and others did so at least in part based on their belief that the victim may have been cooperating with law enforcement, only further supports the notion that this is a horrific and appalling crime deserving of life in prison. The nature and circumstances of the offense strongly support the government's recommended sentence.

## B.   The History and Characteristics of the Defendant Support the Government's Recommended Sentence.

The history and characteristics of the defendant further support the government's recommended sentence. If Salvador's guideline sentence was not already life in prison, the government would have pointed to aggravating factors in Salvador's history that would have supported even an above-guideline sentence. As it stands, Salvador's guideline sentence is life in prison and additional aggravating factors are not needed to impose the recommended sentence of life in prison. However, some additional facts about his background are worth mentioning.

Salvador's history and characteristics—and his actions both before and after the 2018 murder—are truly appalling and outrageous.  The government notes at least some of these facts to counter the expected suggestion that the defendant's background is somehow a mitigating factor.  It is not.  To the extent there are some mitigating factors in the defendant's past, those factors are more than overcome by Salvador's role in MS-13, his role in the two murders, and other aggravating facts about his history and background.

As the presentence report indicates, Salvador had *three prior arrests* for carrying a knife or dangerous weapon *prior* to his first murder.  *See* PSR, ¶ 136 (listing an October 2015 arrest for carrying a knife at a local high school; a June 2016 arrest for carrying a large knife in Chelsea; and a July 2016 arrest for carrying a machete in Boston).  Salvador provided various explanations about these arrests to the immigration judge.  In hindsight, those explanations should at least be viewed with skepticism, and should most likely be viewed with outrage.  Salvador's excuses included a claim that he was carrying a knife in June 2016 because he was bringing it home from work to cut things around the house and he was carrying a machete in July 2016 because he needed to chop wood at his house to grill.  *See id.* Given what we now know about what Salvador likes doing with bladed weapons (and given what he did with a knife on Christmas Eve of 2016), Salvador's explanations about his 2016 knife/machete arrests strain credulity.

It appears that in nearly every interaction Salvador has had with the legal system, Salvador's intention has been to try to manipulate the system and—far from learning a lesson or returning to a law-abiding lifestyle—his reaction has been to engage in more violence or misconduct, making a mockery of those in the orbit of our legal system who were trying to help him.  For example, as part of the pretrial litigation in this case, it was revealed that after Salvador was arrested multiple times in 2016 for carrying a knife or a

machete, Salvador's court-appointed counsel sought a clinical evaluation of Salvador's competency to stand trial.  An evaluation was performed which ultimately led to those cases against Salvador being dismissed because he was found not competent.  It is unclear if the defense will try again at sentencing to introduce the report of Dr. Daniel A. Sanford, the psychologist who performed the evaluation in 2016.  That report is generally unreliable and should be ignored, but for present purposes, the government highlights only the following:  it was staggering to note that the Sanford report was dated December 21, 2016, *a mere three days before Salvador's December 24, 2016 murder of Luis Ruano*. The very week that people were trying to help Salvador avoid trouble for carrying a knife, Salvador not only went out and carried a knife again, but he used a knife to repeatedly stab a teenager to death.

In 2017, ICE agents arrested Salvador based on his suspected membership in MS-13 as well as the belief that Salvador posed a safety threat.  Again, Salvador received the benefit of court appointed counsel, experts, etc.  Again, Salvador misled or manipulated those who were trying to help him by having others obtain for him a successful—albeit entirely undeserved—result.[3]   The information Salvador provided to the immigration court, when viewed with the benefit of hindsight, made a mockery of those legal proceedings.  Salvador and his counsel not only convinced the immigration judge to release Salvador from immigration custody, but they also convinced the immigration judge to revise Salvador's immigration status and adjust his status from nonimmigrant to that of a person admitted for lawful permanent residence.

---

[3]    The government assumes that Salvador misled or manipulated his counsel and others who supported him … and it was not the case that his counsel or others deliberately mislead the immigration court and knowingly introduced false or fraudulent information on Salvador's behalf.

Salvador provided false testimony at the immigration hearing itself.  He also submitted a self-serving affidavit under the pains and penalties of perjury—an affidavit that this investigation has revealed plainly contained material falsehoods.  Attached as Ex. 10 is Salvador's sworn affidavit in connection with his removal proceedings.  Attached as Ex. 11 is the decision of the Immigration Judge in Salvador's case.  Salvador's affidavit shows his contempt for honesty and the Immigration Judge's decision shows how Salvador's various falsehoods materially impacted the Judge's decision.

In his sworn April 2018 affidavit, Salvador made statements such as "I stopped carrying weapons after my July 2016 arrest ….  I have not carried any weapon of any kind since July 2016, and I will not carry a weapon again."  Ex. 10, ¶ 28.  Of course, we now know that Salvador had not only continued carrying weapons after July 2016, but he used a knife to commit a horrific murder in December 2016.  Salvador also stated, "I am not in MS-13 or any other gang.  I would never join a gang, because my family and I do not like them, and I had such a bad time with them in El Salvador."  *Id.* at ¶ 32.  That, of course, is an obvious lie given what we know about Salvador.

Salvador significantly misled the immigration judge and essentially defrauded the court.  In part, the court summarized Salvador's testimony as follows: "The respondent is not a member of MS-13 and is not a member of any other gang.  He would not join a gang because he does not like them and neither does his family."  Ex. 11 at p. 9.  Salvador claimed to not be competent enough to understand the proceedings against him, but he knew enough to know that he needed to make multiple false statements to help himself.  Salvador apparently managed to convey a sense of credibility when he made his numerous false and fraudulent statements to the court.  The court noted in its decision under a section titled "Credibility and Corroboration" that "The Court finds that the respondent

testified credibly regarding the events that precipitated his arrival in the United States and the events that occurred while in this country." Ex. 11 at p. 20.   The court concluded that "the respondent's credible testimony and documentary evidence persuades the Court that he is, in the aggregate, a credible witness." *Id.*

Unfortunately, the evidence from this case points a very different picture.  The facts revealed during this investigation suggest that Salvador manipulated caring individuals, like his guidance counselor and school psychologist, to submit statements that Salvador was not a violent person, when the undisputed facts show that Salvador was already a murderer by the time of these submissions.  *Id.* at p. 30.  Salvador manipulated the immigration court into concluding that "the respondent has made attempts to rehabilitate himself after his multiple arrests for carrying knives and machetes.  The respondent testified that he has not carried a weapon since his last arrest in 2016.  The respondent testified that he wants to live a peaceful life." *Id.* at p. 30.   The undisputed facts show that far from rehabilitating himself since his prior arrest, Salvador had committed a gruesome murder since his last arrest.

Salvador also misled the immigration court about his tattoos and may have manipulated his immigration lawyer into proffering information that Salvador knew was false or wrong.  For example, a key inquiry at the immigration hearing was whether or not Salvador had any tattoos signifying gang membership.  The evidence now suggests that Homeland Security had introduced a historical picture of Salvador at the hearing that showed his "503" tattoo and the tattoo of his mother's name but may not have shown the other MS-13 tattoo on Salvador's torso.  Salvador took full advantage of this, failing to clarify the record about his tattoos and then claiming that the "503" tattoo was just about his love for El Salvador and the country's phone area code.  In the October 2018 recording,

Salvador told CW-13 how the immigration court had failed to ask about his second gang tattoo and how his lawyer had argued that the 503 tattoo was not gang related:

| CW-13: | And they didn't see what you have over there [referring to the MS-13 tattoo on his torso]? |
|---|---|
| PERVERSO: | This, yes, dog. |
| CW-13: | They didn't ask you what it is? |
| PERVERSO: | No, they didn't ask me what it is. They didn't ask me. |
| CW-13: | Hm. |
| PERVERSO: | And in court, they said, dog, you know, oh, the only tattoo of mine that they show is the 503, dude, and that I have my mother's name, but they don't know what this is, dude. They don't know what this is. They just say that 503 is gang related, and my lawyer was telling them, no, that it's the code when one calls El Salvador. They said to him, okay, that is fine, but that I am affiliated with the gang. Things like that, dude. What's going on here, dude. Sons of bitches, dude. |

Ex. 1 at p. 2.

Perhaps most tragically, the statements made by Salvador in connection with his immigration proceedings were not only false as to material historical facts (e.g., whether he was in a gang, whether he had ever carried weapons, and/or whether he had ever harmed someone), but also false as to Salvador's future intentions (e.g., whether he would engage in future gang activity, whether he would carry a weapon again, and/or whether he would harm someone again).

*Merely a month after securing his release from immigration custody* and manipulating the court into concluding that he was a sincere, rehabilitated person who deserved a chance to become a lawful permanent resident of the United States, Salvador participated in one of the more horrific and brutal murders in recent Massachusetts

history, playing a prominent role in stabbing and hacking a teenager to death in a public park when he committed murder yet again.

As yet one final example of how Salvador has seemingly manipulated people at multiple steps along the way, Salvador somehow also made himself a posterchild for stories about unfair law enforcement efforts to target gangs like MS-13. A mere two weeks before he was indicted for racketeering and murder *in this case*, Salvador appears to have been the *subject of a featured profile* in the Boston Globe about a story on ICE and Boston Police's efforts to detain people like Salvador. *See* "BPD gives gang intel to ICE. A lawsuit wants to know how much." *Boston Globe*, Nov. 15, 2018 (available at www.bostonglobe.com/metro/2018/11/15/boston-police-have-been-giving-gang-intel-ice-lawsuit-wants-know-how-much/giZWh1eKrf9kcJB7KmRKaM/story.html).

The Globe article did not name Salvador, but given the evidence uncovered in this case, it seems obvious that Salvador is the person profiled in that article. The article discussed how "the young man from El Salvador" was identified as a gang member because of his 503 tattoo, clothes, possession of knife, etc., but mentioned how the young man testified at his immigration hearing and convinced the immigration judge to release him in June 2018 because the court was not convinced that the respondent was an active gang member. The article further noted that the immigration judge "approved the man's application for permanent residency and ordered his release" in June 2018. Ending on a hopeful and cheerful note, the article concluded by saying that "he has since been reunited with his infant son and is trying to finish high school."

The tragic reality, of course, is that Salvador *was* an MS-13 gang member and *was* a public safety threat, with more than a passing interest in unconscionable violence. His June 2018 release from custody and receipt of permanent residency in the United States

did not lead Salvador to commit himself to the American dream. He remained, as he had been for years, committed instead to senseless violence. A mere month after he was released from custody, Salvador participated in the brutal murder of an innocent teenager who was stabbed and hacked to death based on the gang's belief that the victim had committed the unforgivable sin of cooperating with law enforcement.

Salvador should actually be the posterchild for someone who has abused the immigration system. He has taken multiple lives, harmed countless worthwhile causes, and has implicitly harmed others who are legitimately trying to avail themselves of the protections of the immigration system (and those who are otherwise trying to improve the system in general).

In highlighting the story above, it is important to note that the government is not casting aspersions on the media, the ACLU, or any other entity's efforts to report on (or bring change to) complex criminal justice or immigration issues. To the contrary, the government is suggesting that Salvador has not only harmed the families from whom he has irretrievably taken loved ones, but he has harmed countless others whom he has never even met through his selfish, manipulative conduct. Those include recent immigrants who are trying to navigate a complex immigration system and fight for a place in this country; people who fighting for civil liberties and trying to shine a light on how the justice system or immigration system operates; people who are trying to elevate the discourse and bring change to our legal and political institutions. Simply put, the actions of violent offenders like Salvador not only cause an indelible harm to their direct victims, but they also impact our social and legal systems on a macro level. It makes a mockery of the immigration system for Salvador to have received lawful permanent residence status given his history and background.

As a final example to show how Salvador had no compunctions about engaging in fraud or misconduct when it came to lawfully living and working in this country, the government also notes that Salvador—on more than one occasion—was found in possession of false identification documents.  The Superseding Information against Salvador (see Dkt. No. 648) and the Superseding Indictment against his co-defendants (see Dkt. No. 83) both specifically alleged that the "possession and use of false identification documents" was part of the pattern of racketeering activity by this criminal enterprise. *See id*. at ¶ 10.  Given the overwhelming evidence of murder, the government has not made much of other types of racketeering activity mentioned in the charging documents, but a brief mention is warranted here.  Included below are three false identification documents seized from Salvador: the first is a false social security card seized in connection with his July 2016 arrest for carrying a machete; and the next two are a false permanent resident card and a different false social security card seized in connection with his immigration arrest in September 2017:



The real example of an innocent, traumatized, young man who needed help to escape violent gang members was not Salvador—it was the victim Salvador cruelly stabbed and hacked to death soon after he was released from immigration custody. Herson Rivas grew up in El Salvador in traumatic circumstances. He was left there by his mother who came to the United States to find a better life for her family. Once she established herself here with her two younger children, the family scrounged together money to help Rivas come to the United States so that he could escape the gang violence that was ravaging El Salvador. After years of struggle and separation, Rivas rejoined his mother and siblings, started attending the local high school, and took his first steps towards building the American dream.



And then, his life was tragically and horrifically cut short by MS-13 gang members like Salvador—someone who essentially defrauded the immigration court into giving him permanent lawful status so he could get released and kill again.

Herson Rivas's body now lies in a grave back in El Salvador—not the result of a violent and senseless death at the hands of MS-13 gang members in the wooded jungles of El Salvador, but the result of a violent and senseless death at the hands of MS-13 members in a wooded park in Massachusetts.  His mother and two siblings are left behind to grieve, forever left to wonder whether their loved one would have been safer in El Salvador than he ended up being in Massachusetts.

Without provocation or justification, Salvador senselessly took two young lives to quench his thirst for murder and mayhem.  The nature and circumstances of the offense and the history and characteristics of the defendant all call for a guideline sentence of life in prison.

Lastly, as to Salvador's history and characteristics, the government cannot help but note Salvador's deplorable conduct while awaiting trial and sentencing in this case.  Despite knowing full well that this Court will take his history and background into consideration when imposing its sentence, Salvador seems to have been entirely unable to conform his conduct to the rules and regulations of the facility.  In the approximately three years in which he has been in pretrial custody, Salvador has seemingly not gone even a few months without picking up a disciplinary infraction in jail.  The presentence report contains two whole paragraphs listing out Salvador's disciplinary history.  The government has independently obtained the disciplinary records of Salvador from these facilities, which corroborate the information contained in the PSR.  The disciplinary records are astounding.  Salvador has not only engaged in misconduct, but he has plainly continued to associate with MS-13 members while in prison and has continued his commitment to MS-13.  These are just some of the troubling examples of his misconduct while in pretrial custody:

- possessing a manufactured weapon in April 2019;

- putting MS-13 graffiti on his cell wall in May 2019;

- possessing a *metal shank* and multiple other pieces of contraband in September 2019 (*resulting in additional criminal charges* in Dedham District Court);

- sending a threatening letter to his classification officer threatening to hurt someone if his housing assignment was not changed in October 2019;

- possessing tattoo paraphernalia and *getting caught being tattooed by his co-defendant Vaquerano* while at Wyatt in February 2020;

- *attacking and stabbing another inmate with a deadly weapon* in April 2020 (*resulting in yet other criminal charges in Superior Court in Rhode Island*);

- putting drawings of MS-13 symbols on his cell wall in June 2020;

- assaulting an officer in September 2020;

- getting tattooed by yet another inmate in January 2021;

- possessing tattoo paraphernalia *with his co-defendant Vaquerano* in March 2021;

- refusing a housing assignment in April 2021;

- again possessing tattoo paraphernalia in May 2021; and

- possessing a sharpened instrument and tattoo paraphernalia in July 2021.

(And all of this does not even get into the incident the Court was made aware of regarding the suspicious legal mail.)

Salvador's own actions indicate that he remains committed to MS-13 and committing violence. It is outrageous that Salvador has managed to get new criminal charges *while in pretrial custody* and has even committed an *armed assault with a deadly weapon* while in prison. Nothing in his background to date suggests any true remorse, true acceptance of responsibility, or true repudiation of the gang he committed himself to. Far from showing mitigation, Salvador's history and characteristics present aggravating factors calling for an even higher sentence. Of course, no aggravating factors

are needed to impose a sentence of life in prison given the horrific murders committed by Salvador and what the guidelines and the law already call for. The court should impose the recommended guideline sentence of life in prison.

**C.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense All Support the Government's Recommended Sentence.**

The remaining Section 3553(a) sentencing factors similarly support the government's recommendation. As the government noted in the Lopez sentencing memorandum, it is hard to imagine a crime more serious, more in need of just punishment, and more of a threat to our governing norms and legal system than the horrific murder of a teenage boy who is lured to a public park and repeatedly stabbed to death because a violent criminal gang is under the belief that the victim may be assisting law enforcement. But yet, Salvador's case presents an example where an even bigger punishment and stronger message is needed. Salvador's racketeering activity involved the horrific murders of not one but *two* teenagers whom Salvador killed with extreme atrocity and cruelty. Salvador committed his murders across multiple years, in multiple cities, across multiple MS-13 cliques, and did all of it with pride and without remorse. His acts deserve life in prison.

In one of the pretrial filings in this case, counsel for Salvador once suggested that the 2018 murder of Rivas was better understood as a "garden variety" state law murder as opposed to a murder that was part of a federal racketeering case targeting a criminal enterprise. Every murder is tragic and every loss of life is uniquely painful, so it is unclear whether any murder is truly a "garden variety" murder. The government notes, however, that if the 2018 murder had actually been charged in state court (and certainly, the evidence against Salvador is overwhelming), Salvador would have faced a *mandatory*

*sentence* of life in prison.  Surely it does not reflect the seriousness of the offense, promote respect for the law, and provide just punishment if Salvador receives *less* for a federal RICO conviction and two murders than what he would have received in state court for only one of the murders.  That would send entirely the wrong message in a case like this.

**D.     The Need to Avoid Unwarranted Sentencing Disparities Further Supports the Government's Recommended Sentence.**

Finally, the government notes that a sentence of life in prison, even though the maximum sentence in this case, is an appropriate and justified sentence that is consistent with how similarly situated defendants have been treated in recent years.  There have been only two MS-13 defendants in recent years who have been sentenced in Massachusetts for RICO conspiracy and held responsible for their participation in two murders:  Edwin Gonzalez a/k/a Sangriento and Noe Perez Vasquez a/k/a Crazy (defendants 32 and 4, respectively, in the *Recinos Garcia* case).  Both were convicted at trial and received sentences of life in prison.  Both their sentences were affirmed by the First Circuit.

The fact that Perez Vasquez and Gonzalez went to trial while Salvador pled guilty before trial should not change the calculus in this limited instance.  In each of these cases, the government has consistently taken the position that murdering multiple people on behalf of a gang like MS-13 deserves a sentence of life in prison.  In each instance, whether the defendants pled guilty before trial or were convicted after trial, the government indicated it would recommend a sentence of life in prison.  The fact that Salvador's damning and chilling admissions to murder made it practically impossible for him to prevail at trial, and the fact that the government had an even more compelling case

against Salvador than it might have had against some others, should not earn Salvador extra credit or somehow get him a lower sentence.

Lastly, there should be no suggestion that sentencing Salvador to life in prison despite pleading guilty would somehow discourage people from pleading guilty. This Court in its sentencing decisions—and the government in its sentencing recommendations—routinely gives defendants credit for pleading guilty. Indeed, in this case alone, the government intends to recommend a sentence of less than life in prison for each of the co-defendants who committed murder even though all of their guideline ranges should be life in prison and despite the fact that the §3553(a) factors would almost assuredly call for a sentence of life in prison had the defendants been convicted after trial and had the defendants not received credit for acceptance of responsibility.

A sentence of life in prison will not deter gang members from pleading guilty. What it hopefully might deter instead is gang members committing multiple murders in horrific, senseless ways. Both the need to avoid unwarranted sentencing disparities and the need to promote deterrence further support the government's recommend sentence.

## CONCLUSION

For the reasons stated in this sentencing memorandum and those to be advanced at the sentencing hearing of Salvador, the government respectfully requests that the Court sentence Salvador to life in prison.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ Kunal Pasricha
KUNAL PASRICHA
KAITLIN R. O'DONNELL
Assistant United States Attorneys

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By: /s/ Kunal Pasricha
KUNAL PASRICHA
Assistant United States Attorney
District of Massachusetts